**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| CAMPAIGN LEGAL CENTER<br>1101 14th Street NW, Ste. 400<br>Washington, DC 20005<br><br>DEMOCRACY 21<br>2000 Massachusetts Avenue, NW<br>Washington, DC 20036<br><br>        Plaintiffs,<br><br>     v.<br><br>FEDERAL ELECTION COMMISSION<br>1050 First Street, NE<br>Washington, DC 20463<br>        Defendant. |

Civil Action No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     Plaintiffs Campaign Legal Center ("CLC") and Democracy 21 bring this action against the Federal Election Commission ("FEC" or "Commission") for declaratory and injunctive relief pursuant to 52 U.S.C. § 30109(a)(8)(A), challenging as contrary to law the FEC's dismissal of two administrative complaints that plaintiffs filed in 2015 alleging that former Florida Governor John Elias "Jeb" Bush and Right to Rise Super PAC, Inc. ("RTR Super PAC"; collectively, "respondents") had violated the Federal Election Campaign Act ("FECA" or "Act") by raising more than $100 million in illegal soft money to support Bush's ill-fated 2016 presidential run.[1]

---

[1] Right to Rise Super PAC later filed an amended Statement of Organization changing its name to Right to Rise USA. *See* Right to Rise USA Statement of Organization, FEC (June 12, 2015), https://docquery.fec.gov/pdf/367/15951468367/15951468367.pdf. RTR Super PAC is distinct from Right to Rise PAC, Inc., a multicandidate committee also established by Bush and registered with the FEC on the same date. *See* Right to Rise PAC, Inc., Statement of Organization, FEC (Jan. 6, 2015), https://docquery.fec.gov/pdf/812/15031363812/15031363812.pdf.

2.      The Commission's August 29, 2022 dismissal of plaintiffs' complaints came only after an extraordinary seven-and-a-half year delay to take action on or resolve the complaints. It followed more than a dozen split votes among the Commissioners that failed to garner the requisite four votes for agency action, *see* 52 U.S.C. § 30106(c). The Commission has not provided a Statement of Reasons for its failure to find "reason to believe" a FECA violation occurred, as required when the Commission acts contrary to the written recommendations of its Office of General Counsel ("OGC") to allow for judicial review, *Common Cause v. FEC*, 842 F.2d 436, 449 (D.C. Cir. 1988), and without which the dismissal fails the basic requirements of reasoned decisionmaking, *see Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986).

3.      Plaintiffs filed their first administrative complaint on March 31, 2015, alleging that Governor Bush had illegally delayed announcing his candidacy, and had engaged in significant "testing the waters" and/or campaign activities using funds raised outside the Act's contribution restrictions (*i.e.*, "soft money"), *see* 52 U.S.C. §§ 30116(a), 30118(a), prior to commencement of his formal candidacy. Admin. Compl. ¶¶ 1-2, MUR 6927 (Mar. 31, 2015), https://www.fec.gov/files/legal/murs/6927/6927_01.pdf.[2] The complaint further alleged that he failed to timely file his statement of candidacy, register his campaign committee, and report his activities as FECA requires, *see* 52 U.S.C. §§ 30102(e), 30103, 30104. Ex. 1, Admin. Compl. ¶¶ 2, 49.

4.      Plaintiffs filed a second administrative complaint with the FEC on May 27, 2015, alleging that Bush had violated 52 U.S.C. § 30125(e) by "establish[ing]," "financ[ing]," "maintain[ing]," and "controll[ing]" RTR Super PAC, which "act[ed] on his behalf" by raising

---

[2] Plaintiffs' March 31, 2015 administrative complaint and its May 27, 2015 supplement are attached hereto as Exhibits 1 and 2, respectively. Other documents in the public file for Matter Under Review ("MUR") 6927 are available on the FEC's website, at https://www.fec.gov/data/legal/matter-under-review/6927.

and spending almost $100 million in soft money raised outside FECA limits to promote Bush's presidential campaign; and that RTR Super PAC violated section 30125(e) by raising and spending soft money on behalf of Bush. Ex. 2, Suppl. Admin. Compl. ¶ 1, MUR 6927 (May 27, 2015), https://www.fec.gov/files/legal/murs/6927/6927_07.pdf.[3]

5.     The Commission failed to take action on plaintiffs' administrative complaints for over seven years, even though its OGC recommended commencing an investigation, and all Commissioners serving in 2018 apparently agreed that there was "reason to believe" FECA was violated with respect to at least two of plaintiffs' allegations, specifically, that: (1) Bush had failed to timely file his statement of candidacy and register his campaign committee, and (2) Bush had failed to comply with FECA contribution restrictions and disclosure requirements in conducting testing-the-waters and/or campaign activity in his pre-candidacy period.[4] Nonetheless, the Commission failed to muster the four votes necessary to formally find reason to believe these violations occurred and to initiate an investigation.

6.     Nor did the Commissioners at any point issue the requisite Statement of Reasons explaining their votes for or against a reason-to-believe finding. On May 13, 2022, three of the currently serving Commissioners who voted to close the file and dismiss the complaints issued a statement asserting that they were unable to provide the basis for their predecessors' 2018 reason-to-believe votes, but characterized those votes as controlling. By its express terms, their Statement thus does not purport to provide any explanation for the Commission's substantive decision.

---

[3] The FEC treated plaintiffs' May 27 administrative complaint as a supplement to the March 31 complaint and designated both as MUR 6927.

[4] *See* First General Counsel's Report ("OGC Rpt."), MURs 6915 & 6927 (Feb. 8, 2017), https://www.fec.gov/files/legal/murs/6927/6927_14.pdf; Certification, MURs 6915 & 6927 (Dec. 6, 2018; dated Dec. 7, 2018), https://www.fec.gov/files/legal/murs/6927/6927_15.pdf; Certification, MURs 6915 & 6927 (Dec. 13, 2018; dated Dec. 14, 2018), https://www.fec.gov/files/legal/murs/6927/6927_16.pdf.

7.      Plaintiffs have suffered, because they, as well as the public, have been deprived of FECA-required disclosure regarding: (1) Bush's "testing the waters" and/or campaign expenditures in the period prior to his official declaration of candidacy in June 2015; and (2) the dates, amounts and purposes of any in-kind contributions made by RTR Super PAC to Bush's campaign arising from the extensive involvement of Bush and his agents in RTR's formation and operations, and the possible coordination of their activities. The deprivation of this information is traceable to FEC's seven-year delay and dismissal of plaintiffs' administrative complaints, and directly and concretely injures plaintiffs' interests in disseminating this information to voters and using it to support their programmatic activities. Ex. 1, Admin. Compl. ¶¶ 34-36, 49.

8.      The FEC's failure to act also allows wealthy donors, including corporations and unions, to sidestep FECA's contribution limits and disclosure requirements by making unlimited contributions to super PACs established, financed, maintained, or controlled by their favored federal candidate. Without enforcement of FECA provisions, such as section 30125(e), designed to prevent such circumvention of the contribution limits, "the integrity of our system of representative democracy is undermined." *Buckley v. Valeo*, 424 U.S. 1, 26-27 (1976) (per curiam).

9.      By failing to act on plaintiffs' complaints for seven years and then dismissing them without providing any rationale for failing to find reason to believe, the Commission has acted contrary to law and failed to satisfy Circuit precedent requiring that controlling FEC Commissioners explain their actions. *Common Cause*, 842 F.2d at 449. This failure encourages the use of candidate-controlled super PACs like RTR Super PAC as vehicles for the wholesale evasion of FECA's contribution limits and disclosure requirements, particularly in the period prior to a formal acknowledgement of candidacy.

## JURISDICTION AND VENUE

10.     This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 52 U.S.C. § 30109(a)(8)(A). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

11.     Venue in this district is proper under 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C. § 1391(e).

## THE PARTIES

12.      Plaintiff CLC is a nonpartisan, nonprofit organization that works to strengthen American democracy through, among other activities, local, state, and federal efforts to ensure that the public has access to information regarding the financing of U.S. election campaigns.

13.     As part of this effort, CLC conducts research, authors reports and articles, and regularly provides expert analysis to the media. CLC is also involved in litigation throughout the country regarding campaign finance matters; files FEC complaints requesting that enforcement actions be taken against individuals or organizations that violate the law; participates in rulemaking and advisory opinion proceedings before the FEC to ensure that the agency is properly interpreting and enforcing federal election laws; and engages in legislative advocacy for reform measures at the federal, state, and local levels.

14.     CLC relies on the accurate and complete reporting of campaign finance information to carry out activities central to its mission, including the production of reports and other materials to educate the public about campaign spending and the true sources and scope of candidates' financial support.

15.     CLC expends significant resources assisting reporters and other members of the media in their investigative research into candidates' financial support and relationships with

donors, to ensure that the public is equipped with the information necessary to evaluate different candidates and messages and to cast informed votes.

16.     CLC also uses its analyses of federal campaign finance disclosure information to support its administrative practice at the FEC and before state and local campaign finance agencies, and to defend campaign finance laws in its active docket of cases in federal and state courts.

17.     When inadequate disclosure of federal campaign finance activity makes it difficult to ascertain the origin or nature of a candidate's financial support, as occurs when a candidate's fundraising and other operations are illegally outsourced to an "independent" super PAC without full disclosure, reporters often contact CLC for guidance as to whether or where they can find the campaign finance information that is not being properly reported. This work requires CLC to divert resources and funds from other organizational needs.

18.     Plaintiff Democracy 21 is a nonprofit, nonpartisan organization dedicated to making democracy work for all Americans through support of campaign finance and other political reforms. To accomplish these goals, it conducts public education efforts, participates in litigation involving the constitutionality and interpretation of campaign finance laws, and engages in efforts to help ensure that campaign finance laws are properly enforced and implemented. It also participates in rulemaking and advisory opinion proceedings, and other administrative matters, at the FEC.

19.     Like CLC, Democracy 21 relies on the accurate and complete reporting of campaign finance information to carry out activities central to its mission, including its public education efforts, reports, and statements about campaign spending and the sources and scope of candidates' financial support. Democracy 21 also expends significant resources to assist members of the media with research into issues of campaign financing and the relationships between

candidates and donors to ensure that the public is broadly and accurately informed on these matters. Democracy 21 also uses its analyses of federal campaign finance disclosure information to support its administrative efforts at the FEC, including its participation in advisory opinion and rulemaking proceedings, as well as the filing of administrative complaints. It also uses such disclosure information in litigation to defend the constitutionality of the campaign finance laws in court.

20.     When such disclosure information is unavailable, inadequate, or inaccurate, such as when candidates are allowed to use supposedly "independent" outside spending groups as de facto coordinated arms of their campaigns, it impedes the ability of Democracy 21 to fulfill its mission and causes Democracy 21 to divert resources and funds from other organizational needs in order to provide the public with accurate information about the facts and implications of how the financing of federal campaigns is occurring.

21.     CLC and Democracy 21 also suffer due to Bush's apparent failure to provide all FECA-required information about his testing-the-waters and/or campaign activity conducted prior to his announcement of candidacy on June 15, 2015, and in particular, information about any in-kind contributions Bush received in the form of payments by RTR Super PAC and RTR Leadership PAC for his travel and public events prior to June 2015.

22.     CLC and Democracy 21 also have been deprived of complete and accurate disclosure information in connection with the fundraising and other activities undertaken by Bush and/or his agents to establish and finance RTR Super PAC, as well as of information regarding the nature of the relationship between RTR Super PAC and the Bush campaign.

23.     Plaintiffs lack information, for instance, about whether RTR Super PAC was affiliated with Bush's campaign committee, 52 U.S.C. § 30116(a)(5), or whether contributors to RTR Super PAC "earmarked" their money specifically for support of the Bush campaign, *id*.

§ 30116(a)(8). The dismissal also deprives plaintiffs of FECA-required information regarding the amounts, dates, and purposes of RTR Super PAC's in-kind contributions to the Bush campaign, including in the form of coordinated expenditures. 52 U.S.C. § 30116(a)(7)(B)(i). *See also CLC v. FEC*, 31 F.4th 781 (D.C. Cir. 2022).

24.    Defendant FEC is an independent federal agency charged with the administration and civil enforcement of FECA. 52 U.S.C. § 30106(b).

## STATUTORY AND REGULATORY BACKGROUND

### A.    *Regulation of the "testing the waters" phase preceding federal candidacy*

25.    The term "candidate" is defined in FECA to mean "an individual who seeks nomination for election, or election, to Federal office," and an individual is deemed to seek nomination for election, or election "if such individual has received contributions aggregating in excess of $5,000 or has made expenditures aggregating in excess of $5,000." 52 U.S.C. § 30101(2); 11 C.F.R. § 100.3(a). "Contributions" and "expenditures" are defined as any "gift" or "payment" made "for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A) (defining "contribution"), (9)(A) (defining "expenditure").

26.    No later than 15 days after becoming a candidate for federal office, the candidate must file a Statement of Candidacy designating his principal campaign committee, 52 U.S.C. § 30102(e)(1), and such committee must register with the FEC no later than 10 days thereafter, *id.* § 30103. The candidate's authorized committee must then file regular, comprehensive reports disclosing all receipts and disbursements, *id.* § 30104, including the receipt of in-kind contributions.

27.    However, "[t]hrough its regulations, the Commission has established limited exceptions to these automatic thresholds which permit an individual to test the feasibility of a

campaign for Federal office"—*i.e.*, to "test the waters"—"without becoming a candidate under the Act." *See* Payments Received for Testing the Waters Activities, 50 Fed. Reg. 9992, 9993 (Mar. 13, 1985) (emphasis added).

28.     The "testing the waters" regulations create "limited exceptions" to the definitions of "contribution" and "expenditure," allowing would-be candidates to engage in pre-candidacy activities without triggering "candidate" status when the funds they raise or spend for this purpose exceed the $5,000 candidate registration threshold. 11 C.F.R. §§ 100.72, 100.131.

29.     Importantly, however, individuals testing the waters may only "use funds permissible under the Act," 11 C.F.R. § 100.72(a), *i.e.*, funds that comply with the federal contribution limits and source restrictions.

30.     This "testing the waters" exception is no longer "applicable" once individuals "decide[] to become candidates," nor does it extend to "activities relevant to conducting a campaign." 11 C.F.R. § 100.72(b). The regulation provides several non-exhaustive "[e]xamples of activities that indicate that an individual has decided to become a candidate," *id.*, including when an individual: "raises funds in excess of what could reasonably be expected to be used for exploratory activities or undertakes activities designed to amass campaign funds that would be spent after he or she becomes a candidate," *id.* § 100.72(b)(2); "makes or authorizes written or oral statements that refer to him or her as a candidate for a particular office," *id*. § 100.72(b)(3); or "conducts activities in close proximity to the election or over a protracted period of time," *id.* § 100.72(b)(4).

31.     If the individual's activities and statements indicate that she has effectively become a candidate, she must designate a principal campaign committee and timely file the required FEC reports disclosing all receipts and disbursements. 52 U.S.C. §§ 30102(e)(1), 30103, 30104.

32.     All funds received or payments made in connection with "testing the waters" conducted pursuant to 11 C.F.R. §§ 100.72(a) and 100.131(a) are "considered contributions or expenditures under the Act," and must be reported in the first report filed by the candidate's principal campaign committee with the FEC. 11 C.F.R. § 101.3. For each such contribution or expenditure made to test the waters, the report must disclose its date, amount, and the name of the relevant contributor or payment recipient. *Id.*

### B. FECA's "soft money" restrictions

33.     In the 2015-16 election cycle, FECA limited to $2,700 the size of a contribution that a presidential candidate can accept from an individual donor. 52 U.S.C § 30116(a)(l); *Archive of contribution limits, 2015-16*, https://www.fec.gov/help-candidates-and-committees/candidate-taking-receipts/archived-contribution-limits/#2015-2016. FECA also prohibits candidates from accepting any contributions from corporations or labor unions. 52 U.S.C § 30118(a). Money raised outside the contribution limits and source requirements are commonly referred to as "soft money."

34.     An independent expenditure-only committee, or "super PAC," is a political committee that may raise contributions outside the limits and source restrictions that otherwise apply to political committees, 52 U.S.C. § 30116(a)(1)(C), provided they make only independent expenditures and do not contribute to, or coordinate their spending with, candidates.

35.     Single-candidate super PACs, *i.e.*, super PACs devoted to advocating the election of a single candidate, like RTR Super PAC, provide a potential avenue for donors to circumvent the contribution limits by directing unlimited, otherwise illegal soft-money contributions to PACs connected to their preferred candidates.

36.     The "soft money" prohibition in Section 30125(e)(l) is meant to counter the circumvention of FECA's contribution limits and source requirements, and provides:

> A candidate, individual holding Federal office, agent of a candidate or individual holding Federal office, or an entity directly or indirectly *established, financed, maintained or controlled* by or acting on behalf of 1 or more candidates or individuals holding Federal office, shall not -
>
> > (A) solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, unless the funds are subject to the limitations, prohibitions, and reporting requirements of this Act; . . .

52 U.S.C. § 30125(e)(1) (emphasis added).

37.     This prohibition is broadly drafted. It applies to any candidate for Federal office or Federal officeholder or to any "agent" of a candidate or of an officeholder, as well as to any "entity directly or indirectly established, financed, maintained or controlled by or acting on behalf of" a candidate or officeholder. 52 U.S.C. § 30125(e)(1). Such candidates, officeholders, agents, and entities cannot "solicit, receive, direct, transfer or spend funds in connection with an election for Federal office" unless those funds comply with the contribution limits and prohibitions, and reporting requirements, of federal law. *Id.*

38.     Thus, section 30125(e) makes clear that candidates cannot do indirectly what they cannot do directly: candidates and their campaign committee are prohibited from directly raising or spending soft money.

39.     The Commission has promulgated regulations to implement this provision. *See* 11 C.F.R. §§ 300.60, 300.61. The regulations apply to "Federal candidates" and to "[e]ntities that are directly or indirectly established, financed, maintained or controlled by, or acting on behalf of, one or more Federal candidates or individuals holding Federal office." *Id.* § 300.60(a), (d). Such candidates and entities shall not "solicit, receive, direct, transfer, spend or disburse funds in connection with an election for Federal office" unless such funds "consist of Federal funds that are subject to the limitations, prohibitions and reporting requirements of the Act." *Id.* § 300.61.

### C. FECA's regulation of in-kind contributions

40.     Because a PAC "established, financed, maintained or controlled" by a candidate would likely be operating on behalf of, or in coordination with, the candidate, section 30125(e) also works as a prophylactic measure to prevent the coordinated expenditures and other in-kind contributions that might otherwise result.

41.     The payment for any goods or services for a candidate's campaign is an "in-kind" contribution under the Act. *See* 52 U.S.C. § 30101(8)(A)(ii); 11 C.F.R. § 104.13. Thus, if a PAC pays for services rendered to a candidate's campaign, it constitutes an in-kind contribution subject to FECA's contribution limits, source restrictions, and disclosure requirements. 52 U.S.C. §§ 30104, 30116(a)(1)(A), 30118(a); 11 C.F.R. §§ 104.13, 109.20(b).

42.     Importantly, this principle also applies in the pre-candidacy "testing the waters" phase. Any payments by federal political committees to fund testing-the-waters activities benefiting a federal candidate made before the individual announces their candidacy constitute "in-kind contributions" from the political committee to the candidate. 11 C.F.R. §§ 110.2(l), 9034.10; *see also* Public Financing of Presidential Candidates and Nominating Conventions, 68 Fed. Reg. 47386, 47387, 47407 (Aug. 8, 2003) (addressing "situations where unauthorized political committees closely associated with a particular individual planning to run for President defray costs that are properly treated as in-kind contributions" "during the 'testing the waters' phase and before"). When the individual becomes a candidate, these payments must be reported as in-kind contributions to the campaign. 11 C.F.R. § 101.3.

43.     All expenditures made "in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents" (*i.e.*, coordinated expenditures) are also treated as in-kind contributions to that candidate. 52 U.S.C.

§ 30116(a)(7)(B)(i). This is because coordinated expenditures function as "disguised contributions"—and failing to regulate them as such creates a risk of corruption and conceals the true sources of candidates' support. *Buckley*, 424 U.S. at 46-47.

44.     For each reporting period, a candidate-authorized committee must disclose the total contributions received from other committees, including in-kind contributions in the form of coordinated expenditures. 52 U.S.C. § 30104(b)(2)(D). The candidate's report must itemize each committee contribution, and state its date, value, and whether it was in support of the candidate's primary or general election. *Id.* § 30104(b)(3)(B); *see Instructions for FEC Form 3P and Related Schedules*, https://www.fec.gov/resources/cms-content/documents/fecfrm3pi.pdf (updated May 2016).

45.     Likewise, for each reporting period and for the entire election cycle, a non-candidate committee must disclose its total contributions to other committees, including in-kind contributions, and itemize all contributions made to other committees, stating for each the date, value, and recipient's name and address. 52 U.S.C. § 30104(b)(6)(B)(i), (b)(6)(H)(i). In addition, because in-kind contributions by a committee are also expenditures of that committee, the report must disclose the person to whom each expenditure is made and its date, amount, and purpose. *Id.* § 30104(b)(5)(A).

### D. The statutory framework for FEC administrative complaints.

46.     Any person may file a complaint with the FEC alleging a violation of the Act. 52 U.S.C. § 30109(a)(1).

47.     After reviewing the complaint, any response from the person or entity alleged to have violated the Act, and the recommendations of its OGC, the Commission votes on whether there is sufficient reason to believe the Act was violated to justify an investigation. 52 U.S.C.

§ 30109(a)(2). A reason-to-believe finding is appropriate where a complaint "credibly alleges" a violation of the FECA "may have occurred." FEC, Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process, 72 Fed. Reg. 12545, 12545 (Mar. 16, 2007).

48.    After any investigation, if the Commission finds probable cause to believe a FECA violation occurred, 52 U.S.C. § 30109(a)(3), it seeks a conciliation agreement with the respondent, which may include civil penalties, *id*. § 30109(a)(4)(A), (5). If the Commission is unable to correct the violation and enter a conciliation agreement, it may institute a civil action in federal district court. *Id*. § 30109(a)(6)(A). All of these decisions require four affirmative votes. *Id*. § 30106(c).

49.    If, at any of these decision-making junctures, fewer than four Commissioners vote to proceed despite a recommendation from OGC to take action, the controlling group of Commissioners who voted against proceeding must issue a Statement of Reasons to serve as the basis for any judicial review. *Common Cause*, 842 F.2d at 449.

50.    If the Commission cannot muster four votes to proceed at any of these decision-making junctures, the Commission can elect either to vote again at a later date to take action, or to vote to dismiss the complaint. If four or more Commissioners vote to dismiss the proceedings, the matter is closed, and the MUR file is placed on the public record.

51.    If four commissioners fail to find reason to believe a FECA violation has occurred and the Commission then dismisses the matter, the complainant, as a "party aggrieved" by the dismissal, may seek judicial review in the United States District Court for the District of Columbia. 52 U.S.C. § 30109(a)(8).

52.    The district court reviewing the FEC's dismissal of a complaint may declare the FEC's actions "contrary to law," 52 U.S.C. § 30109(a)(8)(C), and order the FEC "to conform with

such declaration within 30 days," *id*. If the FEC fails to abide by the court's order, the Act provides the complainant with a private right of action, brought in the complainant's own name, "to remedy the violation involved in the original complaint." *Id.*

**FACTUAL BACKGROUND**

*A. CLC's and Democracy 21's administrative complaints*

53.     CLC and Democracy 21 filed an FEC complaint against former Florida Governor John Ellis "Jeb" Bush on March 31, 2015, alleging that there was reason to believe Bush had become a federal candidate under FECA but had failed to register or file required disclosure reports disclosing his activities to "test the waters" for his presidential campaign, and that he had financed his campaign and testing-the-waters activities with illegal "soft money" outside of applicable FECA contribution limits and source restrictions. The FEC designated the complaint Matter Under Review ("MUR") 6927.

54.     The March complaint noted that as early as December 16, 2014, Bush publicly announced on Facebook that he had "decided to actively explore the possibility of running for President of the United States." Ex. 1, Admin. Compl. ¶ 4. Shortly thereafter, on January 6, 2015, Bush and his associates formed two PACs: the Right to Rise Super PAC and a multicandidate committee (which Bush referred to as his "leadership PAC"), also named Right to Rise. *Id.*; *see also* OGC Rpt. 6 n.18. According to reports, Bush's team set an initial fundraising goal of $100 million, and dozens of PAC fundraising events were soon scheduled for the first months of 2015. *Id.* ¶¶ 6-8, 11.

55.     Citing news reports, the complaint alleged that Bush engaged in a quantum of fundraising in the early months of 2015 that demonstrated that he had moved beyond pre-candidacy or even "testing the waters," and was operating as an active candidate. Ex. 1, Admin.

Compl. ¶¶ 10-11. Bush, who was reportedly on "a nonstop fundraising tour" for the Super PAC, *see id*. ¶ 11, attended and spoke at numerous fundraising events, including a $100,000-per-ticket fundraiser for the Super PAC in New York City in February and a $25,000-minimum event in Bel Air on March 31. *Id.* ¶¶ 11, 13.

56.     Citing news reports, the March complaint also alleged that Bush was engaged in a number of activities in February and March 2015 that are associated with primary candidates: he traveled to early primary states like South Carolina and met with potential donors and staff; he spoke at the Conservative Political Action Conference and functionally acknowledged he was testing the waters for a presidential candidacy; he attended the Iowa agriculture summit and spoke about his policy positions alongside other Republican presidential hopefuls; and he was announced as a speaker for the Iowa Republican Party's Lincoln dinner scheduled later that spring. Ex. 1, Admin. Compl. ¶¶ 12, 17-19.

57.     On these grounds, the complaint argued there was reason to believe that Bush had already become a "candidate" under FECA but had failed to timely comply with the candidate registration and disclosure requirements established by 52 U.S.C. §§ 30102(e), 30103, and 30104, and 11 C.F.R. § 101.3; and that Bush, prior to candidacy, had financed undisclosed testing-the-waters or campaign activities with funds not compliant with FECA, *see* 52 U.S.C §§ 30116(a)(l), 30118. Ex. 1, Admin. Compl. ¶¶ 48-49.

58.     On May 27, 2015, CLC and Democracy 21 filed a second complaint with the FEC against respondents Governor Bush and RTR Super PAC, alleging that while Bush held himself out as a candidate for the Republican nomination for U.S. President, Bush and his agents established RTR Super PAC, and thereafter both directly and indirectly financed, maintained, and controlled RTR Super PAC. *See, e.g.*, Ex. 2, Suppl. Admin. Compl. ¶¶ 1, 9, 11.

59.     Citing news reports, the administrative complaint detailed the involvement of Bush and his close advisors in "establishing" RTR Super PAC. *See* Ex. 2, Suppl. Admin. Compl. ¶¶ 11-19. For example, Bush and his agents reportedly took a direct role in recruiting high-level staff for RTR Super PAC, such as by installing Mike Murphy, one of Bush's top advisers, at its helm. *See id*. ¶ 12.

60.     The supplemental administrative complaint also alleged that Jeb Bush directly or indirectly "controlled" and "maintained" RTR Super PAC while a candidate for office, citing reports that, among other things, Bush's advisers were "overseeing the operations of" RTR Super PAC, Ex. 2, Suppl. Admin. Compl. ¶ 11, that Bush attempted to delay a formal announcement of his candidacy to maximize his soft-money fundraising for RTR Super PAC, *id*. ¶¶ 12, 16-18, and that Bush and RTR Super PAC developed a division of labor between his official authorized committee and the super PAC to operate as a unified campaign effort, *id*. ¶¶ 16-18

61.     The supplemental administrative complaint also alleged that Bush and his agents "financed" RTR Super PAC, and that Bush himself, *see id.* ¶ 20, his advisors, *id.* ¶ 24, and members of his family personally conducted fundraising for RTR Super PAC, *id.* ¶ 26.

62.     The supplemental complaint urged the Commission to find reason to believe that Bush had violated 52 U.S.C. § 30125(e) by establishing, financing, maintaining, and controlling the RTR Super PAC, Inc., and that RTR Super PAC violated section 30125(e) by raising and spending soft money on behalf of Bush, and to commence an investigation into these allegations.

63.     On June 5, 2015, shortly after plaintiffs filed their supplemental complaint, Bush signed his statement of candidacy, and publicly declared his candidacy and registered his campaign committee on June 15, 2015. *See* OGC Rpt. 5. Over the course of the 2015-2016 election cycle, Right to Rise Super PAC spent over $86 million on behalf of Jeb Bush's presidential run. *Right to*

*Rise USA Financial Summary 2015-16*, FEC, https://www.fec.gov/data/committee/C00571372/?cycle=2016 (last visited Oct. 28, 2022).

### B. CLC's and Democracy 21's Delay Case

64.    By March 2020, over four years had elapsed since the filing of plaintiffs' administrative complaints without any final agency action on the complaints. Accordingly, on March 13, 2020, CLC and Democracy 21 filed an action under 52 U.S.C. § 30109(a)(8)(A) based on unlawful agency delay, arguing that the FEC's failure to act on plaintiffs' administrative complaints after more than 120 days since their filing was contrary to law. *See* Compl., *CLC v. FEC/ Right to Rise*, No. 1:20-cv-00730-CRC (D.D.C. Mar. 13, 2020), ECF No. 1.

65.    The FEC failed to appear in the lawsuit and was declared in default on March 5, 2021. One of the administrative respondents, RTR Super PAC, sought and was granted leave to intervene on June 8, 2020.

66.    Plaintiffs' delay suit was dismissed without prejudice on standing grounds, although in denying plaintiffs' subsequent motion for reconsideration of the dismissal, the Court acknowledged that intervening D.C. Circuit authority had reversed a lower court decision upon which it had relied. *See* Mem. Op. & Order, *CLC v. FEC/ Right to Rise*, No. 1:20-cv-00730-CRC (D.D.C. July 14, 2022), ECF No. 39 (citing *CLC v. FEC*, 31 F.4th 781 (D.C. Cir. 2022)).

67.    However, on August 29, 2022, before the deadline to appeal the district court's ruling expired, the FEC dismissed plaintiffs' underlying administrative complaints.

### C. Administrative Proceedings

68.    The administrative proceedings in MUR 6927 became public, for the first time, following the dismissal of plaintiffs' administrative complaints. *See* 52 U.S.C. § 30109(a)(4)(B)(ii); 11 C.F.R. § 111.20(a). The release of this MUR file revealed both that the

Commission's OGC had made findings of fact that largely corroborated the allegations in plaintiffs' administrative complaints, and that four Commissioners reviewing the matter had voted at various times to find reason to believe with respect to at least some of the alleged FECA violations.

*Office of General Counsel Report*

69.    For instance, the MUR file showed that on February 8, 2017, after reviewing plaintiffs' administrative complaints and the respondents' written responses, OGC issued its report recommending that the Commission find reason to believe that: (1) Bush failed to timely register as a candidate, and his authorized campaign committee, Jeb 2016, Inc. ("Jeb 2016") failed to timely register and report with the Commission; (2) Bush received excessive, unreported in-kind contributions from RTR Leadership PAC because it paid for testing-the-waters and/or campaign activity, in particular his travel and speaking events; and (3) Bush violated 52 U.S.C § 30125(e) by establishing, financing, maintaining, or controlling RTR Super PAC, and the Super PAC violated this provision by soliciting and receiving soft money on behalf of the Bush campaign. *See* OGC Rpt. 4-5.[5]

70.    *First*, based on Bush's public statements, the quantity and nature of his activities and fundraising after May 2014, and his relationship with RTR Super PAC and RTR Leadership PAC, OGC recommended finding reason to believe that Bush had decided to run for President at least as early as January 2015, and therefore had violated 52 U.S.C. § 30102(e)(l) and 11 C.F.R. § 101.l(a) by failing to timely file a statement of candidacy and designating a principal campaign committee. OGC Rpt. 12-19.

---

[5] The Commission considered plaintiffs' complaints alongside a separate complaint filed by Brad Woodhouse and American Democracy Legal Fund, which made similar allegations about Bush and RTR Super PAC in connection to the 2016 election cycle. OGC Rpt. 1.

71.     OGC found that Bush began spending funds to test the waters of a 2016 presidential candidacy in May 2014. OGC Rpt. 28. It also noted that after a December 16, 2014 Facebook post announcing these exploratory efforts Bush announced his "plan to establish a Leadership PAC," and RTR Leadership PAC registered with the FEC shortly thereafter on January 6, 2015. *Id*. at 6-7. On January 6, 2015, the same day that the leadership PAC registered, RTR Super PAC registered with the FEC as an independent expenditure-only political committee. *Id.* at 7.

72.     OGC found that Bush traveled extensively and spoke at numerous events in the months following his December 2014 announcement. On January 20, 2015, Bush and his "operatives" reportedly announced plans to hold 60 fundraising events in cities across the country in coordination with both RTR Leadership PAC and RTR Super PAC. OGC Rpt. 8.

73.     OGC observed that most of the money Bush raised in this period went into the coffers of RTR Super PAC, which had already amassed over $100 million in funds by June 2015 that would be used to support Bush's candidacy. OGC Rpt. 9. Once Bush declared his candidacy in June, the pace of the Super PAC's fundraising slowed considerably, and it reported receipts of only about $15 million in the period between June and December 2015. *Id.* at 10.

74.     OGC found that Bush's substantial participation in RTR Super PAC's fundraising efforts from January to June 2015 provided strong reason to believe he had decided to run for President in January 2015. In support of its conclusion, OGC noted that the Super PAC's admitted purpose was to support Bush's eventual candidacy, not to explore the feasibility of a campaign, OGC Rpt. 15, and RTR Super PAC's fundraising declined noticeably after June 2015 when it simultaneously began spending funds on advertising and other activities in support of Bush's candidacy, *id.* at 16.

75.     *Second*, OGC recommended finding reason to believe that Jeb 2016 violated 52 U.S.C. § 30104(b) and 11 C.F.R. §§ 100.72(a) and 100.131(a) by failing to properly report all of Bush's testing-the-waters activity, and in particular, failed to report significant in-kind contributions from RTR Leadership PAC in the form of payments for Bush's pre-candidacy travel. OGC Rpt. 27-32.

76.     OGC noted that shortly after Bush's June 2015 official declaration of candidacy, Jeb 2016 filed its first disclosure report covering Bush's spending in his testing-the-waters period (May 2014 through June 2015), disclosing $516,870 for research and polling, consulting, and legal fees. The report disclosed only a single payment of $1,089 for travel expenses. OGC Rpt. 6. In contrast, RTR Leadership PAC reported spending $4,896,426 between January and June 2015, *id.* at 7, with travel expenses totaling over $800,000, *id.* at 29-30.

77.     OGC noted that respondents conceded that RTR Leadership PAC funded some portion of Bush's travel and event schedule between January and June 2015 but argued that Bush was appearing at such events as RTR's Chairman. OGC Rpt. 29. But OGC noted that publicly available video footage of these events showed at least nine instances of Bush speaking about his possible run for office, without any references to RTR Leadership PAC or its work. *Id*. at 19. OGC thus rejected Bush's contention that any references to his candidacy were merely "incidental" and not indicative of a testing-the-waters purpose.

78.     OGC found that the evidence was unclear as to whether RTR Leadership PAC paid for any expenses that would qualify as a non-travel testing-the-waters expenditure. OGC Rpt. 31. It also found the record unclear as to whether RTR Super PAC may have funded any of Bush's activities to test the waters. OGC thus recommended no action "at this time" on these allegations, noting however, that if its recommended investigation into Bush's testing-the-waters activities

uncovered evidence that RTR Leadership PAC or Super PAC paid for additional testing-the-waters expenses, it would "make the appropriate recommendation" then. *Id.* at 34.

79.     *Third*, because OGC found that "Bush became a candidate at least as early as January 2015," OGC Rpt. 20, it found reason to believe that RTR Super PAC was established, financed, maintained, and controlled by Bush, and solicited and received non-federal funds while Bush was a candidate in violation of 52 U.S.C. § 30125(e). OGC Rpt. 19-27.

80.     The first basis for this conclusion was that OGC found "significant commonalities, including common or overlapping officers or employees," between RTR Super PAC and RTR Leadership PAC, an entity Bush admitted he established and controlled. OGC Rpt. 21. Indeed, the record indicated that the same person, Charles Spies, established both PACs. *Id.* at 22.

81.     Second, OGC found that prior to June 2015, Bush provided the Super PAC with material specifically intended to ensure the Super PAC could effectively support Bush's candidacy, including hours of interview footage that the Super PAC team could use in campaign commercials in the future.

82.     Third, OGC found that Bush was an "integral" part of RTR's fundraising, noting that Bush's involvement may have gone beyond merely serving as a featured speaker at Super PAC fundraisers and included a substantive role in planning fundraisers as well. OGC Rpt. 22.

83.     In addition, OGC found that the record indicated that RTR Super PAC was an entity "acting on behalf" of Bush for purposes of section 30125(e), given that Bush acknowledged that RTR Super PAC was formed to support his candidacy, and there was no evidence that the Super PAC made any expenditures to further the election of any other candidate. OGC Rpt. 23-24.

84.     RTR Super PAC ultimately spent a total of $86.8 million in purportedly independent expenditures to support Bush or to defeat his opponents in the Republican presidential

primary. *Right to Rise USA Financial Summary 2015-16*, FEC, https://www.fec.gov/data/committee/C00571372/?cycle=2016 (last visited Oct. 28, 2022).

*Commission Votes*

85.     The release of the MUR file following the August 29, 2022 dismissal also showed that on December 6, 2018, the Commission voted on whether to find reason to believe that: (1) Bush failed to timely declare his candidacy in violation of 52 U.S.C. § 30102(e)(l), and that the Jeb 2016 committee failed to timely register in violation of 52 U.S.C. §§ 30103(a) and 30104; (2) Bush and Jeb 2016 violated 52 U.S.C. § 30116 by accepting excessive contributions from RTR Leadership PAC in the period prior to the commencement of his official candidacy; and (3) Bush and RTR Super PAC violated the soft money restrictions at 52 U.S.C. § 30125(e). The vote split 2-2, with Commissioners Walther and Weintraub voting affirmatively for the motion, and Commissioners Hunter and Petersen dissenting. *See* Certification, MURs 6915 & 6927 (dated Dec. 7, 2018), https://www.fec.gov/files/legal/murs/6927/6927_15.pdf.

86.     As the MUR file showed, on December 13, 2018, the Commission again voted on reason to believe, but only on the pre-candidacy charges, and not on the soft money-related violations connected to 52 U.S.C. § 30125(e). This time the split 2-2 vote was reversed, with Commissioners Hunter and Petersen voting affirmatively for the motion, and Commissioners Walther and Weintraub dissenting. *See* Certification, MURs 6915 & 6927 (dated Dec. 14, 2018), https://www.fec.gov/files/legal/murs/6927/6927_16.pdf.

87.     Thus, as Commissioner Weintraub would later explain, all four Commissioners found reason to believe with respect to the alleged violations relating to Bush's announcement of candidacy and acceptance of undisclosed excessive contributions prior to candidacy, but differed on whether to find reason to believe with respect to the soft money-related violations of 52 U.S.C.

§ 30125(e). As a result, the Commission held no vote—at least on the same motion—in which all four then-Commissioners voted to find reason to believe that the two pre-candidacy violations occurred, despite the apparent consensus on these two charges. Statement of Reasons of Comm'r Ellen L. Weintraub ("Weintraub Stmt.") 1, 3, MURs 6915 & 6927 (Sept. 30, 2022), https://www.fec.gov/files/legal/murs/6927/6927_27.pdf.

88.     No Commissioner issued a Statement of Reasons at the time of these votes explaining their rationale for voting against reason to believe with respect to the alleged violations relating to Bush's announcement of candidacy and acceptance of undisclosed excessive contributions prior to candidacy. Of the four Commissioners voting in 2018 only Commissioner Weintraub remains serving on the Commission.

89.     Thereafter, in three votes on April 9, April 23, and May 7, 2019, respectively, the Commission voted on whether to close the file and dismiss plaintiffs' complaints. Each of these votes failed to garner the required four votes for agency action and the matter remained open. *See* Certification, MURs 6915 & 6927 (Apr. 9, 2019), https://www.fec.gov/files/legal/murs/6927/6927_20.pdf; Amended Certification, MURs 6915 & 6927 (dated May 8, 2019), https://www.fec.gov/files/legal/murs/6927/6927_17.pdf; Certification, MURs 6915 & 6927 (May 7, 2019), https://www.fec.gov/files/legal/murs/6927/6927_18.pdf.

90.     On May 23, 2019, the Commission failed by a vote of 0-2 to dismiss this case on the ground of prosecutorial discretion. Certification, MURs 6915 & 6927 (dated May 24, 2019), https://www.fec.gov/files/legal/murs/6927/6927_19.pdf.

91.     Thereafter, the Commission voted on at least two additional occasions on whether to close the file, dismiss the matter pursuant to an exercise of prosecutorial discretion, and/or authorize defense of plaintiffs' failure-to-act lawsuit which had been filed in March 2020. All of

these votes failed to gain a majority. *See* Certification, MURs 6915 & 6927 (June 23, 2020; dated Aug. 14, 2020), https://www.fec.gov/files/legal/murs/6927/6927_21.pdf (voting 2-2 to close the file and authorize defense of suit, and 0-2 to dismiss under *Heckler v. Chaney*); Certification, MURs 6915 & 6927 (Jan. 11, 2022; dated Jan. 13, 2022), https://www.fec.gov/files/legal/murs/6927/6927_22.pdf (failing by a vote of 3-3 to close the file and dismiss the matter).

92.    On August 29, 2022, the Commission finally voted 4-1 to close the case file and thereby dismiss plaintiffs' complaint. *See* Notification to Democracy 21 and Campaign Legal Center, MUR 6927 (Sept. 1, 2022), https://www.fec.gov/files/legal/murs/6927/6927_23.pdf. This constituted, for the first time, final agency action on plaintiffs' administrative complaints.[6]

*Commissioners' Statements of Reasons*

93.    The release of the MUR file in August 2022 also revealed that no Commissioners provided a contemporaneous statement of reasons explaining their decisions for or against a reason-to-believe finding in the votes that had occurred in 2018.

94.    After the release of the MUR file, Commissioner Weintraub issued a Statement of Reasons, dated September 30, 2022, noting that she was the only Commissioner still serving on the FEC that was present at the time of the 2018 reason-to-believe votes. Weintraub Stmt. 1. She discussed the nature of the gridlock on the Commission at the time, explaining that her "colleagues were willing to acknowledge that Bush and his campaign filed a late statement of candidacy, and possibly received excessive in-kind contributions in the form of subsidized travel expenses, [but]

---

[6] No certification for the August 29, 2022 vote is posted in the public file for MUR 6927 available on the FEC's website. *See* https://www.fec.gov/data/legal/matter-under-review/6927/. However, the file for MUR 6915, which the FEC consolidated with plaintiffs' complaint, contains a certification for both matters dated August 29. *See* Certification, MURs 6915 & 6927 (Aug. 29, 2022), https://www.fec.gov/files/legal/murs/6915/6915_41.pdf.

they would not lift a finger to investigate the question that really mattered here—whether candidate Bush established, financed, maintained, or controlled the Right to Rise USA super PAC." *Id.*

95.     She further explained that no other Commissioner present for these votes had issued a statement explaining their votes:

> Nothing precluded the Republican commissioners who voted not to pursue the RTR USA super PAC [soft money] violations from writing a statement and leaving it with the files of this matter before they quit the Commission. They simply did not do so. My current Republican colleagues never voted on the merits of this matter and have pointedly disclaimed any opinion on the merits of this matter. The Commission's dismissal of the $100+ million allegation in this matter is thus utterly unexplained, and under D.C. Circuit precedent, literally no one has any authority to explain it.

Weintraub Stmt. 4.

96.     She concluded by faulting the Commission for its failure to act on "an alleged nine-figure violation of a core provision of the Act with nary a word of explanation," Weintraub Stmt. 4, opining: "If that's not arbitrary and capricious, I don't know what is." *Id.*

97.     Current Commission Chair Allen Dickerson and Commissioners Sean J. Cooksey and James E. "Trey" Trainor, III, issued a Statement on May 13, 2022, before their August vote to close the file in this case. Statement of Reasons of Chairman Allen Dickerson and Comm'rs Sean J. Cooksey and James E. "Trey" Trainor, III ("Dickerson, Cooksey & Trainor Stmt."), MURs 6915 & 6927 (May 13, 2022), https://www.fec.gov/files/legal/murs/6927/6927_26.pdf. These Commissioners stated that they were not on the Commission at the time of what they described as the operative substantive votes—the December 2018 reason-to-believe votes—and could not attempt to explain their predecessors' reasoning for those votes. Instead, they opined that they had "never been presented with an opportunity to vote on the substance of these Matters, and [they] take no position on the merits of the decisions reached by our predecessors in declining to find reason to believe by the four affirmative votes that the Act requires." *Id.* at 5.

98.     These Commissioners acknowledged that if the 2018 reason-to-believe votes had in fact formally "concluded" the matter, "the complainant *should then have* been notified that the Commission had declined to proceed with enforcement, [and] statements of reasons released by our predecessors explaining their votes." Dickerson, Cooksey, and Trainor Stmt. 2 (emphasis added). They further noted that had the FEC duly followed its lawful processes, the complainants would have been able to determine "whether or not to challenge the Commission's dismissal as 'contrary to law'" and the "reviewing court would have, after considering the statements of reasons issued by the 'controlling commissioners' . . . made a determination on the merits as to whether our predecessors acted with 'reason or caprice.'" *Id.* at 2.

99.     They followed by candidly admitting: "That is not what happened." *Id.*

100.    Commissioners Dickerson, Cooksey, and Trainor then outlined the multiple failed Commission votes to resolve plaintiffs' complaints, but concluded that "[e]ven if we disagreed with the Commission's 2018 decision, that vote was taken, and the Commission has declined to enforce." *Id.* at 5. Because these three Commissioners erroneously believed that the matter was "concluded" in December 2018 upon the reason-to-believe vote of their predecessors and the Commission now "lack[ed] jurisdiction to do otherwise given the elapsed statute of limitations," they "voted to close the file." *Id.*

101.    Commissioners Dickerson, Cooksey, and Trainor did not invoke prosecutorial discretion in discussing their dismissal of this matter, and indeed, they erroneously concluded that the Commission lacked jurisdiction to proceed.

102.    The Commissioners' cursory suggestion that the statute of limitations at 28 U.S.C. § 2462 deprived them of jurisdiction to pursue further enforcement action is contrary to relevant FEC and judicial authority, including precedents of this Court, holding that section 2462 does not

preclude declaratory or injunctive relief. *FEC v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15, 20-21 (D.D.C. 1995); *FEC v. Christian Coalition*, 965 F. Supp. 66, 71-72 (D.D.C. 1997). Thus, even if their invocation of the statute of limitations were relevant to the Commission's decisive votes "on the substance of these matters," Dickerson, Cooksey & Trainor Stmt. 5—which they concede were their predecessors' reason-to-believe votes—their statute of limitations argument is also "incorrect" as a matter of law. Weintraub Stmt. 6; *see also id*. ("The Commission has considerable equitable remedies available to it that are not subject to 28 U.S.C. § 2462.").

103.     Chairman Dickerson later separately issued a supplemental statement to highlight several points of legal disagreement with Commissioner Weintraub. Suppl. Statement of Reasons of Chairman Allen Dickerson, MURs 6915 & 6927 (Oct. 4, 2022), https://www.fec.gov/files/legal/murs/6927/6927_28.pdf. But his supplemental statement also stressed again that "the D.C. Circuit requires a Statement of Reasons for the Commission's merits determination—that is, its 2018 decision not to find [reason to believe]—rather than a discussion of its decision to close the file. . . . Meaningful judicial review is necessarily directed toward the Commission's substantive acts and the explanations thereof." *Id*. (footnote omitted).

## CAUSES OF ACTION

**Count I: FECA, 52 U.S.C. § 30109(a)(8)(A)**

104.     Plaintiffs repeat and reallege paragraphs 1-103.

105.     Plaintiffs' administrative complaints in MUR 6927 established reason to believe that: (1) Jeb Bush failed to timely declare his candidacy and comply with the candidate registration and reporting requirements, *see* 52 U.S.C. §§ 30102(e)(1), 30103 and 30104, including failing to report all of his testing-the-waters and/or campaign spending prior to declaring his candidacy, *see* 11 C.F.R.§ 101.3; (2) Bush used funds not in compliance with the contribution limits and source

restrictions at 52 U.S.C. §§ 30116(a) and 30118(a), including payments made by Bush, RTR Leadership PAC, and RTR Super PAC to pay for testing-the-waters and campaign activity prior to his declaration of candidacy; and (3) Bush violated 52 U.S.C. § 30125(e) by "establish[ing]," "financ[ing]," "maintain[ing]," and "controll[ing]" RTR Super PAC, both directly and indirectly through his agents, and RTR Super PAC violated section 30125(e) by raising and spending soft money on behalf of Bush.

106.    The Commission's failure to issue any statement of reasons explaining the Commissioners' votes against finding reason to believe that these violations occurred is per se arbitrary, capricious, and contrary to law. *See* 52 U.S.C. § 30109(a)(8)(A); *Common Cause*, 842 F.2d at 449.

107.    Relatedly, the Commission's refusal to formally vote to find reason to believe and commence an investigation under 52 U.S.C. § 30109(a)(2)—when there was documented consensus among all four Commissioners in the relevant period that there was reason to believe at least two of the alleged violations had occurred—was inherently arbitrary and capricious, irrational, and contrary to law.

108.    In the alternative, although the Statement issued by Commissioners Dickerson, Cooksey, and Trainor, by its terms, does not purport to provide the controlling rationale for judicial review, it too relied on impermissible interpretations of the Act and was arbitrary, capricious, and contrary to law. *See* 52 U.S.C. § 30109(a)(8)(A); *Orloski*, 795 F.2d at 161.

### REQUESTED RELIEF

WHEREFORE, plaintiffs request that this Court:

(1)    Declare that the FEC's dismissal of plaintiffs' administrative complaints was arbitrary, capricious, and contrary to law under 52 U.S.C. § 30109(a)(8)(A);

(2)     Order the FEC to conform with this declaration within 30 days pursuant to 52

U.S.C. § 30109(a)(8)(C);

(3)     Award plaintiffs their costs and reasonable attorneys' fees incurred in this action;

and

(4)     Grant such other relief the Court may deem just and proper.


Dated: October 28, 2022

Respectfully submitted,

/s/ Tara Malloy
Tara Malloy (DC Bar No. 988280)
Megan P. McAllen (DC Bar No. 1020509)
CAMPAIGN LEGAL CENTER
1101 14TH ST. NW, SUITE 400
WASHINGTON, D.C. 20005
(202) 736-2200

Fred Wertheimer (DC Bar No. 154211)
DEMOCRACY 21
2000 Massachusetts Avenue N.W.
Washington, DC 20036
(202) 355-9600

Donald J. Simon (DC Bar No. 256388)
SONOSKY, CHAMBERS, SACHSE,
ENDRESON & PERRY, LLP
1425 K Street N.W., Suite 600
Washington, DC 20005
(202) 682-0240

*Attorneys for Plaintiffs*