**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CAMPAIGN LEGAL CENTER, *et al.*,** | |
| Plaintiffs, | |
| v. | Case No. 22-cv-3319 (CRC) |
| **FEDERAL ELECTION COMMISSION**, | |
| Defendant. | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Back in 2015, Plaintiffs Campaign Legal Center and Democracy 21 filed two administrative complaints with the Federal Election Commission ("FEC" or "Commission") concerning former Florida Governor Jeb Bush's unsuccessful 2016 presidential campaign.  The organizations accused the Bush campaign and its affiliated Right to Rise Super PAC of violating the Federal Election Campaign Act ("FECA"), <u>see</u> 52 U.S.C. § 30101 <u>et seq.</u>, by improperly coordinating their efforts, thereby violating the applicable contribution limits and disclosure requirements, and by failing to report "testing the waters" expenditures before Bush officially launched his candidacy.  The complaints sat dormant before the Commission for nearly five years.  Plaintiffs thus sought to spur action by suing the Commission in this Court, contending that the lengthy delay was contrary to law.  The Court did not reach the merits of this charge, however, finding instead that Plaintiffs lacked standing to pursue their claims because they had not established an informational injury or any other constitutionally sufficient basis to sue.

After the FEC ended the administrative limbo by closing the file on these complaints, the Plaintiffs returned to this Court with a new suit challenging those dismissals.  The Commission has responded by filing a motion to dismiss, arguing that this Court's prior determination that Plaintiffs lacked standing to pursue their prior case precludes Plaintiffs from attempting to re-

enter federal court to bring another action based on the same underlying facts.  And even if Plaintiffs were permitted to relitigate their Article III standing, the FEC maintains that dismissal would still be appropriate because any remand would be futile given that a controlling block of Commissioners has expressed the view that this matter ought to remain closed.

The Court agrees the doctrine of issue preclusion bars Plaintiffs from a second crack at alleging informational injury.  By contrast, the Court is unconvinced by the FEC's argument that the previous rejection of Plaintiffs' organizational injury in the delay case dooms their current allegation of organizational injury here.  That does not mean that organizational standing offers Plaintiffs a clear path to federal court, however, as there are significant hurdles to this alternative basis for standing that the parties did not confront in their briefings.  Namely, the parties did not examine whether the Court's prior judgments concerning informational injury spill over and contaminate the organizational injury asserted here, or whether the Plaintiffs plausibly alleged an ongoing injury to their groups stemming from this long-passed presidential campaign.  Nor did the parties adequately address whether remand would truly be an act of futility because 28 U.S.C. § 2462's five-year limitations period prevents the Commission from taking enforcement action at this late date.  The Court will therefore deny the FEC's motion to dismiss without prejudice to renewal so that the parties can ventilate these unresolved issues.

## I.    Background

The Court has described the procedural and legal background in several opinions in the prior case, so it provides only a summary of the relevant details here.  See Campaign Legal Ctr. v. FEC ("RTR I"), 520 F. Supp. 3d 38 (D.D.C. 2021); Campaign Legal Ctr. v. FEC ("RTR II"), 578 F. Supp. 3d 1 (D.D.C. 2021); Mem. Op. & Order, Campaign Legal Ctr. v. FEC ("RTR III"),

No. 20-cv-730 (CRC) (July 14, 2022) (ECF No. 39).  But even this abbreviated rendition takes us on a long and winding journey to today's decision.

In 2015, Plaintiffs lodged two administrative complaints with the FEC alleging that former Florida Governor Jeb Bush violated the FECA through his extensive interactions with the Right to Rise Super PAC during his then-ongoing presidential bid.  The first complaint in March 2015 accused Governor Bush of violating various provisions of the statute by unlawfully delaying his registration as a candidate in the presidential race, failing to disclose "testing the waters" expenditures, and illegally funding his (still not yet official) candidacy with "soft money" contributions from Right to Rise that evaded FECA limitations.  See Compl. ¶ 3.  The second complaint filed two months later contended that Bush violated 52 U.S.C. § 30125(e) when he "establish[ed]" and "controll[ed]" Right to Rise as a ruse to raise millions of dollars on his behalf without regard for the FECA's contribution limits or source prohibitions.  See id. ¶ 4.  Among other requested relief, these two complaints urged the FEC to require the Bush campaign and Right to Rise to make additional disclosures of two categories of information: "(1) Bush's spending when he was (at the very least) testing the waters of a possible presidential bid; and (2) Right to Rise's in-kind contributions to the Bush campaign" through its coordinated expenditures.  RTR I, 520 F. Supp. 3d at 45.

After these complaints had languished in administrative purgatory for nearly five years, Plaintiffs filed a petition in this Court arguing that the FEC's failure to act was contrary to law under 52 U.S.C. § 30109(a)(8)(A) and requesting declaratory and injunctive relief to compel the FEC to consider their complaints.  Id. at 41–42.  In this "delay" case, the Plaintiffs asserted two injuries that they claimed were sufficient to confer Article III standing.  First, they alleged that the Commission's inaction had resulted in a cognizable *informational* injury because the FECA

entitled them to know "the extent of coordination between Right to Rise and the Bush campaign" as well as "the extent of Bush's campaign spending both during the testing the waters phase of his campaign and after Bush had moved beyond testing the waters to become a candidate under the FECA."  Id. at 42 (cleaned up).  Second, Plaintiffs alleged they had suffered *organizational* injuries due to the FEC's inaction because the failure to close the administrative file and release the Commission's underlying records forced these election watchdogs to divert their resources and efforts away from other organizational needs.  Id.  After the Commission did not appear through counsel to defend itself, Right to Rise successfully intervened as a defendant and moved to dismiss the Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(1) based on their lack of standing.  Id.

The Court initially issued a split decision on informational standing, finding Plaintiffs had adequately alleged informational injury based on Bush's purported failure to report testing-the-waters activities but failed to do so when it came to the allegations of coordinated spending between the Bush campaign and Right to Rise.  Regarding the testing-the-waters activities, the Court reasoned that, on Plaintiffs' account, Governor Bush was testing the waters of a possible presidential run as early as January 2015 but only disclosed expenditures going back to June of that year.  Id. at 45.  Taking these allegations as true, it appeared Plaintiffs had been deprived of nearly "five months of information that is statutorily required to be disclosed" and that would aid Plaintiffs in their missions to safeguard elections—a textbook informational injury.  Id. at 46.

As to the claims of unreported coordinated spending, the Court found that Plaintiffs failed to allege a legally cognizable informational injury.  The Court first recounted Plaintiffs' theory of their injury by noting the "FECA designates coordinated payment for goods or services for a candidate's campaign as 'contributions.'"  Id. at 47 (quoting 52 U.S.C. § 30116(a)(7)(B)).  As

contributions, the Court explained, coordinated expenditures are "subject to [the] FECA's contribution limits and source restrictions, 52 U.S.C. §§ 30116(a), 30118(a), are counted towards the $5,000 threshold that triggers candidate status, id. § 30101(2), and are required disclosures for both the contributor and the recipient, id. § 30104(b); 11 C.F.R. § 104.13." Id. at 47.  In other words, if the Bush campaign established or controlled Right to Rise, both "would be required to provide detailed disclosures of each coordinated expenditure." Id.  Plaintiffs therefore claimed an informational injury because, in their telling, neither Right to Rise nor the Bush campaign disclosed any in-kind contributions.  Id.

Even accepting Plaintiffs' allegations as true, however, the Court concluded "it is well-established that a plaintiff has no legally cognizable interest in a legal conclusion that carries certain law enforcement consequences nor in forcing the FEC to get the bad guys." Id. (cleaned up).  Plaintiffs insisted that they did not seek a simple legal determination but rather additional factual information—namely, which of Right to Rise's disbursements were coordinated in-kind contributions.  But the Court resolved that this "attempt to construe their request as being one for facts (rather than legal determinations)" ran contrary to Wertheimer v. FEC, 268 F.3d 1070 (D.C. Cir. 2001), which the Court found had foreclosed assertions of a "statutory right to determining whether an expenditure should be deemed a 'coordinated' (and thus an in-kind) contribution under [the] FECA." RTR I, 520 F. Supp. 3d at 47–48.  While it was "conceivable that certain facts are necessarily implied by the label 'coordinated,'" the Court reasoned that Wertheimer had resolved this rabbit-duck problem when holding that "a finding of coordination is, at bottom, 'a legal conclusion that carries certain law enforcement consequences.'" Id. at 48 (quoting Wertheimer, 268 F.3d at 1075).  Plaintiffs attempted to distinguish Wertheimer on the ground that they did not aim to affix the label of "coordinated" on some designated set of expenditures

but instead sought to understand what portion of Right to Rise's expenditures fit that mold.  Id.

Yet the Court found this distinction "immaterial" because it could not escape Wertheimer's

holding "that plaintiffs have no legally cognizable interest in labeling spending 'coordinated' if

that spending has already been disclosed in some format."  Id.  Because Right to Rise had in fact

disclosed all the challenged expenditures in some form, the Court concluded that Plaintiffs

lacked informational standing to inquire into which of those disbursements were coordinated

with the Bush campaign.  Id.

    The Court was not alone in reaching this result, as it cited to another decision from this

District with a familiar case caption: Campaign Legal Center v. FEC ("CLC I"), 507 F. Supp. 3d

79 (D.D.C. 2020).  The court in CLC I held that "a faithful reading of Wertheimer" precluded the

plaintiffs there from asserting an informational injury stemming from a super PAC's failure to

disclose coordinated expenditures with Hilary Clinton's 2016 presidential campaign because, in

its view, Wertheimer "squarely held that a finding of 'coordination' does not amount to a 'fact'

that must be disclosed under the FECA, but rather is a 'legal conclusion that carries certain law

enforcement consequences.'"  Id. at 85–86 (quoting Wertheimer, 268 F.3d at 1075).  And as this

Court was in RTR I, the court in CLC I was unmoved by plaintiffs' counterarguments that they

sought "additional factual information" in the form of disaggregation of expenditures that the

super PAC had disclosed only as lump-sum expenses, such as salary and payroll, which the

plaintiffs claimed should have been broken out into separate line items revealing which portions

constituted in-kind contributions to the Clinton campaign.  Id. at 87.  Permitting this "end-run

around Wertheimer" would render that decision a dead letter, the court insisted, as "a plaintiff

armed with this theory could seemingly manufacture standing in nearly every conceivable case"

by claiming that a subset of previously disclosed expenditures should be treated as coordinated and then asserting an interest in knowing what precise portion that is.  Id. at 87–88.

Although this Court fully agreed with CLC I on these matters in its first opinion, the case was set to proceed forward because the Court had found Plaintiffs adequately alleged an informational injury related to the purportedly unreported testing-the-waters activities between January and June of 2015.  But that changed when Right to Rise filed a motion for reconsideration, arguing that all expenditures during this five-month period already had been disclosed in some format either in Governor Bush's first campaign finance report or in Right to Rise's disclosure reports.  RTR II, 578 F. Supp. 3d at 3.  Plaintiffs had pointed to five public appearances as to which they maintained Bush had not reported travel and lodging expenses, id. at 5, but an additional round of briefing and a hearing revealed that these expenditures were already in the public record, id. at 6–7.  Before granting the motion for reconsideration and dismissing the case, the court noted that whether this pattern of spending violated the FECA's soft-money prohibition did not change the standing analysis because the Court already had decided that "plaintiffs are not entitled to a legal conclusion that carries certain law enforcement consequences."  Id. at 6 n.4 (cleaned up).

It was then Plaintiffs' turn to move for reconsideration, which they did by requesting that the Court clarify its ruling on their organizational standing based on the FEC's delay in acting on their administrative complaints and the Commission's corresponding failure to release its Matter Under Review ("MUR") detailing its internal deliberations and findings.  On reconsideration, the Court rejected this alternative basis for standing on the ground that the D.C. Circuit had held that the FEC's failure to process complaints in a timely manner is insufficient for Article III standing.  See RTR III at 5.  It also held Plaintiffs could not sidestep this result by reframing their injury

7

around access to the MURs because, under 52 U.S.C. § 30109(a)(12)(A), the FEC cannot release these files until the close of all administrative proceedings.  Plaintiffs' analogy to <u>People for the Ethical Treatment of Animals v. USDA</u> ("<u>PETA</u>"), 797 F.3d 1087 (D.C. Cir. 2015), was thus of no avail.  Although <u>PETA</u> held that an organization suffers a concrete injury if its operations are disrupted by the nondisclosure of information that a group has no legal *right* to obtain, <u>see</u> <u>id.</u> at 1094–95, the Court found "no legal authority" extending this theory to a circumstance where the law *forbade* disclosure, <u>see</u> <u>RTR III</u> at 8–9.  Accordingly, the Court found Plaintiffs had failed to satisfy the standard for organizational standing.

But there was still one last wrinkle.  While Plaintiffs' motion for reconsideration was pending, they filed a notice of supplemental authority alerting the Court to <u>Campaign Legal Center v. FEC</u> ("<u>CLC II</u>"), 31 F.4th 781 (D.C. Cir. 2022), which reversed <u>CLC I</u> and held that the plaintiffs in that case had suffered an informational injury based on the nondisclosure of whether certain super PAC expenditures were coordinated with the Clinton campaign, <u>id.</u> at 792–93.  The Circuit's decision in <u>CLC II</u> began by observing that the "seminal case" of <u>FEC v. Akins</u>, 524 U.S. 11 (1998), had established that the FECA grants voters a legal interest in information about "the role [a political committee]'s financial assistance might play in a specific election," <u>CLC II</u>, 31 F.4th at 789 (quoting <u>Akins</u>, 524 U.S. at 21).  It then noted that the Circuit had carried that principle forward in <u>Shays v. FEC</u>, 528 F.3d 914 (D.C. Cir. 2008), when holding that "'the injury deemed sufficient to create standing in <u>Akins</u>' is present when a voter is denied FECA-required disclosures about coordinated in-kind expenditures they believe must be reported as contributions to a candidate,'" <u>CLC II</u>, 31 F.4th at 789 (quoting <u>Shays</u>, 528 F.3d at 923).  That logic, the court held, applied equally to the plaintiffs' alleged injuries in the case at hand, which could not be dismissed as merely requests for legal determinations.  <u>Id.</u> at 790.  The plaintiffs

instead sought information that was "not currently known and [could not] be gleaned from the disclosures that have already been made" because, while the super PAC had disclosed its aggregate expenses, it had not "broken down its expenditures to show which were coordinated contributions to the Clinton campaign." Id. at 783.  If plaintiffs prevailed, the super PAC and the Clinton campaign would have to disaggregate those figures to reveal "the numerical *amounts* of any coordinated expenditures."  Id. at 790 (emphasis in original).  The Circuit held that these unknown amounts clearly "constitute factual information core to [plaintiffs'] established interests in knowing who is funding presidential candidates' campaigns and how much money a candidate spent on an election." Id. at 790–91 (citations and quotation marks omitted).  The case was therefore governed by the well-established principle that where, as here, "a plaintiff demonstrates on the record that additional, statutorily-required information would be exposed under plaintiff's theory of the law that would serve an interest Congress sought to protect through disclosure, the plaintiff has undoubtedly established an informational injury under Akins and Shays."  Id. at 792; see also id. at 791 ("There is no doubt that those numerical amounts constitute factual information and that FECA requires them to be disclosed.").

The Circuit managed to harmonize Wertheimer, despite what the district court had said below, insisting that "the facts in Wertheimer [were] markedly different from the facts in [CLC II]."  Id. at 791.  "The principal holding in Wertheimer," it explained, "is that a plaintiff cannot establish injury based on information that is already available 'from a different source' and that would only result in 'duplicative reporting.'"  Id. (quoting Wertheimer, 268 F.3d at 1075).  This holding doomed the plaintiffs' challenge in Wertheimer because the political parties there already had reported all challenged transactions as coordinated expenditures and disaggregated the costs in their financial reports.  Id.  Any further enforcement action against the campaign for

failing to comply with the FECA therefore could reveal only the "same information from a different source."  Id. (quoting Wertheimer, 268 F.3d at 1075).  It was in that rare circumstance that the Circuit found that the plaintiffs lacked a cognizable informational injury.  But that was not true in CLC II, where the challenged expenditures had not been disaggregated because *no* entity had reported them as coordinated contributions.  Id. at 792.  Wertheimer was thus inapt, the Circuit insisted, and any fears of an end-run around that decision were misguided because it was already "settled law that a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them."  Id. at 793 (citation and quotation marks omitted).

This logic applied with equal force to the claims of coordination between Right to Rise and the Bush campaign, and thereby supplied the Plaintiffs here with a key to get into federal court.  But, for some reason, they failed to turn the latch.  While they noted CLC II in their motion for reconsideration and maintained that it "controvert[ed] the Court's holding that plaintiffs did not suffer informational injury," Plaintiffs did not request that the Court revisit its informational standing decision.  RTR III at 11.  As such, the Court held that CLC II was beyond the scope of their motion but informed Plaintiffs that they were "free to raise this argument on appeal."  Id.  Plaintiffs declined this invitation, however, standing pat as the period to appeal elapsed on September 12, 2022.

Perhaps CLC's quiescence was spurred by the fact that, on August 29, the Commission finally acted by voting 4-1 to dismiss Plaintiffs' underlying complaints—thereby mooting the delay case.  See Opp'n at 20.  Closure of the administrative case gave the Plaintiffs access to the trove of information previously hidden in the MURs, including records of several failed "reason

to believe" votes which, under 52 U.S.C. § 30106(c), must garner four affirmative votes for the Commission to investigate a complaint.  See Mot. Dismiss at 7–8.

The MURs revealed that, in February 2017, the Commission's Office of General Counsel had issued a report recommending the Commission find reason to believe that (1) Governor Bush failed to timely register as a candidate; (2) the Bush campaign received unreported, excessive in-kind contributions from Right to Rise; and (3) Bush and Right to Rise had violated the FECA's soft-money restrictions because Bush effectively had established or controlled the PAC.  See FEC, First General Counsel's Report 4–5, MURs 6915 & 6927 (Feb. 8, 2017).[1]  In doing so, the report detailed Right to Rise's funding of Governor Bush's travel expenses related to what should have been characterized as campaign events.  See id.  Despite these recommendations and the underlying evidence, the Commission deadlocked 2-2 on this trio of charges in December 2018 with then-Commissioners Hunter and Petersen dissenting.  Mot. Dismiss at 8.  When the Commission held a second vote one week later based on a pruned set of claims that abandoned the alleged soft-money violations, it deadlocked again—this time with Commissioners Walther and Weintraub in dissent.  Id.  These deadlocked reason-to-believe votes were followed by repeated rounds of failed efforts to close the administrative file, and thus formally dismiss the complaints, over the next three years.  Id.  In the interim, there was significant churn among the Commission's members.  In May 2022, three of the new members drafted a "Statement of Reasons" explaining their votes to close the file that Spring.  See Statement of Reasons of Chairman Allen Dickerson and Comm'rs Sean J. Cooksey and James E. "Trey" Trainor, III, MURs 6915 & 6927 (May 13, 2022) ( "Dickerson Statement").[2]  Declining to take a position on

---

[1]  Available at https://www.fec.gov/files/legal/murs/6927/6927_14.pdf.

[2]  Available at https://www.fec.gov/files/legal/murs/6927/6927_26.pdf.

the merits of the initial reason-to-believe vote, these Commissioners maintained that the failure to secure four affirmative votes in 2018 effectively terminated any proceeding based on the original complaint and that the "five-year statute of limitations ha[d] long passed" on considering the charges.  Id. at 5 & n.28 (citing 52 U.S.C. §§ 30145(a), 2462).

These Commissioners did not speak for the agency, however, and an official statement did not come until one month after the FEC finally voted to close the file when Commissioner Weintraub—who was part of the controlling block that prevented the trimmed charges from going forward—issued her own Statement of Reasons.  See Mot. Dismiss at 10 (noting that Weintraub's "statement provides the rationale for the Commission for purposes of judicial review for those claims").  Rather than mount a substantive defense of the dismissal or assert prosecutorial discretion, Weintraub criticized the Commission for turning a blind eye to the well-documented allegations that Bush and Right to Rise had used soft money to advance Bush's presidential campaign.  Statement of Reasons of Comm'r Ellen L. Weintraub, MURs 6915 & 6927 (Sept. 30, 2022).[3]  She concluded her Statement by expressing her hope that the Plaintiffs would petition for judicial review and that the courts would break through the partisan gridlock.

That is exactly what Plaintiffs did.  Two months later, Plaintiffs returned to this Court alleging that the FEC's dismissal without an investigation violated 52 U.S.C. § 30109(a)(8)(A).  Echoing their previous complaint, these election watchdogs claimed the FEC's dismissal inflicted two distinct harms: (1) an informational injury by depriving them of FECA-required disclosures related to Bush's testing-the-waters activities and coordinated expenditures with Right to Rise; and (2) an organizational injury by forcing them to divert resources from their

---

[3]  Available at https://www.fec.gov/files/legal/murs/6927/6927_27.pdf.

regular activities relating to governmental transparency and accountability to "fill in the gaps to the best of their ability, including by explaining to reporters, researchers, and partner organizations how they might attempt to find information not properly reported."  Opp'n at 41–42.

This time, the FEC entered an appearance and promptly moved to dismiss the case under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  The Commission primarily argues that Plaintiffs lack standing to proceed in federal court, despite what the D.C. Circuit held in CLC II, because the doctrine of issue preclusion bars Plaintiffs from re-litigating this Court's judgment in the prior proceeding finding Plaintiffs have no legally cognizable injury.  But even if the Court had jurisdiction over the present claims, the FEC contends that the requested relief—remand to the agency—would be futile given that "three Commissioners have indicated that they view the matter as long settled and expressed concerns related to the statute of limitations."  Mot. Dismiss at 20; see Am. Train Dispatchers Ass'n v. ICC, 26 F.3d 1157, 1163 (D.C. Cir. 1994) ("A remand is unnecessary where, as here, the outcome of a new administrative proceeding is preordained.").  The Court will now once more wade into the troubled waters of this protracted dispute.

## II.  Legal Standards

When analyzing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, courts must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged."  Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up).  That said, courts need not accept bare legal conclusions nor unsupported inferences.  See, e.g., Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).  To overcome a Rule 12(b)(1) motion, plaintiffs must show "by a preponderance of the evidence that the Court has subject matter

jurisdiction to hear [the] case." <u>Biton v. Palestinian Interim Self-Gov't Auth.</u>, 310 F. Supp. 2d 172, 176 (D.D.C. 2004).

To survive a Rule 12(b)(6) motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ramirez v. Blinken</u>, 594 F. Supp. 3d 76, 85 (D.D.C. 2022) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)). Although a court must accept all well-pleaded factual allegations, it need not accept legal conclusions. <u>Browning</u>, 292 F.3d at 242. "In determining whether a complaint fails to state a claim, [a court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." <u>EEOC v. St. Francis Xavier Parochial Sch.</u>, 117 F.3d 621, 624 (D.C. Cir. 1997).

### III.   Analysis

Plaintiffs raise two bases for their Article III standing to pursue this case: informational standing and organizational standing. While Plaintiffs have a winning argument on the merits of their invocation of informational standing, the doctrine of issue preclusion prevents the Court from reconsidering that matter now. With respect to organizational standing, however, the FEC failed to demonstrate that the decision in <u>RTR III</u> finding that Plaintiffs lacked any cognizable organizational injury to challenge the FEC's delay and accompanying refusal to release the MURs necessarily implies Plaintiffs lack organizational standing to challenge the subsequent dismissal of their complaints. The Court will thus deny the Commission's current Rule 12(b)(1) motion at this juncture. But that does not mean that Plaintiffs have satisfied Article III. Rather, the Court has significant concerns over (1) whether the preclusive effect of this Court's prior judgments in <u>RTR I</u> and <u>RTR II</u> infect this alternative theory, and (2) whether Plaintiffs adequately alleged an *ongoing* injury required for the *injunctive* relief they seek. Because the

briefs do not delve into these jurisdictional challenges, the dismissal here will be without prejudice to renewal.  If Plaintiffs choose to push forward with their theory of organizational standing, the Commission is invited to submit a further motion to dismiss addressing these issues.

Until the Court settles this jurisdictional matter, it would be premature to adjudicate the FEC's futility argument.  The Court nonetheless notes the only plausible path for asserting that the outcome of any further proceedings is preordained is if the limitations period has tolled—an argument the Commission gestures toward but does not forcefully assert.  The Court accordingly directs the Commission to clarify its position on the matter if it opts to renew this argument in a subsequent motion to dismiss.

A. Informational Standing

Plaintiffs first and foremost rely on informational standing to "satisfy the 'irreducible constitutional minimum' of Article III standing: injury-in-fact, causation, and redressability." Shaw v. Marriott Int'l, Inc., 605 F.3d 1039, 1042 (D.C. Cir. 2010) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555 (1992)).  Under this doctrine, "denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them."  Campaign Legal Ctr. v. FEC, 952 F.3d 352, 356 (D.C. Cir. 2020) (citation omitted).  The D.C. Circuit in CLC II made clear that this test is satisfied under the exact fact pattern presented here: an election watchdog challenging the Commission's dismissal of its administrative complaints and alleging that the dismissal deprived the group access to FECA-required information concerning a super PAC's coordinated expenditures with a presidential campaign. The FEC does not contest as much, nor could it.  The Commission instead claims that the

similarities are beside the point because, under the doctrine of issue preclusion, the Court's prior judgments that Plaintiffs lacked informational standing in RTR I and RTR II based on materially identical factual allegations bar Plaintiffs from asserting this basis for standing in the present action.  The Court agrees.  While its prior rulings on the matter were erroneous in light of CLC II, Plaintiffs chose not to appeal those decisions when they had the chance and are now bound by the determination that they lack informational standing.

A party asserting issue preclusion must show that three conditions are met: (1) "the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case"; (2) "the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case"; and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination." Martin v. Dep't of Justice, 488 F.3d 446, 454 (D.C. Cir. 2007).  A "court conducting an issue preclusion analysis does not review the merits of the determinations in the earlier litigation," Consol. Edison Co. of N.Y. v. Bodman, 449 F.3d 1254, 1257 (D.C. Cir. 2006), and "even a patently erroneous first judgment is insufficient to bar issue preclusion," Canonsburg Gen. Hosp. v. Burwell, 807 F.3d 295, 306 (D.C. Cir. 2015) (cleaned up).  This test "applies to threshold jurisdictional issues like standing as well as issues going to a case's merits." Nat'l Ass'n of Home Builders v. EPA, 786 F.3d 34, 41 (D.C. Cir. 2015).  However, this Circuit has recognized a "curable defect" exception to the preclusive effect of prior jurisdictional determinations which "permits an action to proceed if the jurisdictional ground for dismissal of the original suit has been remedied by occurrences arising after the dismissal of the first action." Newdow v. Bush, 355 F. Supp. 2d 265, 274–75 (D.D.C. 2005).

There is no real beef that the first and second requirements for issue preclusion are met here.  The prior "delay" case involved the same cast of characters making identical arguments about Plaintiffs' alleged informational injuries stemming from the Commission's purported failure to enforce the FECA by requiring the Bush campaign and Right to Rise to (1) disclose all testing-the-waters expenditures prior to Governor Bush announcing his candidacy, and (2) identify and disaggregate all coordinated expenditures.  Those are the same informational injuries Plaintiffs claim here.  And while Plaintiffs are now challenging the FEC's dismissal of their complaints rather than its initial delay in considering them, that distinction carries little weight here because "[i]ssue preclusion bars relitigation 'even if the issue recurs in the context of a different claim.'"  Swanson Grp. Mfg. LLC v. Jewell, 195 F. Supp. 3d 66, 73 (D.D.C. 2016) (quoting Taylor v. Sturgell, 553 U.S. 880, 892 (2008)).[4]  It is also beyond dispute that the Court decided this matter against Plaintiffs in RTR I and RTR II and that this determination was integral to the Court's dismissal of the delay action for lack of standing.  Whether Plaintiffs are barred from relitigating their claim of informational injury therefore turns on the third requirement: that preclusion must not work a basic unfairness on Plaintiffs in this action.

In considering this fairness prong, courts are reluctant to apply issue preclusion "when there has been [1] an intervening change in controlling legal principles, [2] when a party to be bound lacked an incentive to litigate in the first trial, especially in comparison to the stakes of the second trial, and [3] when the prior proceedings were seriously defective."  UMC Dev., LLC v. District of Columbia, 401 F. Supp. 3d 140, 157 (D.D.C. 2019) (cleaned up).  Plaintiffs hang their

---

[4]  That in no way means Plaintiffs are forever barred from asserting informational standing, as there is a well-established exception to issue preclusion for questions of law, such as this, "arising in successive actions involving unrelated subject matter."  United States v. Stauffer Chem. Co., 464 U.S. 165, 171 (1984) (cleaned up).  The issue for Plaintiffs is that the subject matter here is not unrelated from the prior suit—indeed, it is essentially the same.

hat on the first hook, maintaining that the D.C. Circuit's ruling in <u>CLC II</u> constituted a change in the law by reversing <u>CLC I</u>, a decision upon which this Court relied in rejecting Plaintiffs' theories of informational standing in the delay case.  <u>See</u> Opp'n at 25.  The Commission retorts that <u>CLC II</u> did not change the law but rather applied "settled" precedent to correct the district court's misapplication of existing legal principles and misreading of what the Circuit had held in <u>Wertheimer</u>.  <u>See</u> Mot. Dismiss at 19 (quoting <u>CLC II</u>, 31 F.4th at 793).  The Commission has the better of the argument.

The Court is tempted to avoid admitting error in the delay case by maintaining that, under then-prevailing law, it was right to reject the invocation of informational injury but that the legal landscape has since shifted beneath its feet.  That is not how the D.C. Circuit saw things, however.  As described above, <u>CLC II</u> did not claim to overturn any existing law.  The Circuit insisted that it was engaged in nothing more than a straightforward application of longstanding principles stretching back to <u>Akins</u> and <u>Shays</u>, which held that citizens have a cognizable injury when they are denied access to FECA-required disclosures.  <u>CLC II</u>, 31 F.4th at 789–90. Contrary to what the district court below held, the Circuit insisted that <u>Wertheimer</u> did not upend these principles or create a special carve out for the disclosure of coordinated expenditures by casting them off as simple "legal conclusions."  It instead expressed "no doubt" that the requested disaggregation of coordinated expenditures "constitute[d] factual information and that FECA requires them to be disclosed," <u>id.</u> at 791, and concluded that <u>Wertheimer</u> stood for the limited proposition "that a plaintiff cannot establish injury based on information that is already available 'from a different source' and that would only result in 'duplicative reporting,'" <u>id.</u> (quoting <u>Wertheimer</u>, 268 F.3d at 1075).  Thus, outside of the rare case where some party has

already reported and disaggregated all coordinated expenditures, <u>Wertheimer</u> does not stand in the way of citizens pursuing an FECA claim in federal court.  <u>See</u> <u>id.</u> at 791–93.

One might question whether this is an accurate characterization of <u>Wertheimer</u>, as the district court on remand noted that the Circuit's characterization did "not really grappl[e] with [its] contrary analysis."  <u>Campaign Legal Ctr. v. FEC</u> ("<u>CLC III</u>"), No. 19-cv-2336 (JEB), 2022 WL 17496220, at *4 (D.D.C. Dec. 8, 2022).  Indeed, it is noteworthy that <u>CLC II</u> described <u>Wertheimer</u>'s "principal holding" by quoting from Judge Garland's limiting concurrence.  <u>CLC II</u>, 31 F.4th at 791 (quoting <u>Wertheimer</u>, 268 F.3d at 1075 (Garland, J., concurring)).  But no matter how this Court reads <u>Wertheimer</u>, it is not free to double down on its own understanding by disregarding the Circuit's binding interpretation of that decision or characterization of what it was up to in <u>CLC II</u>.  The Court must accept that <u>CLC II</u> did not change any controlling law but rather reasserted what <u>Wertheimer</u> had meant all along.  At most, then, <u>CLC II</u> corrected a misperception that was pervasive among courts in this District, and the fact it overruled <u>CLC I</u>— a case this Court cited to in <u>RTR I</u>—is immaterial to the calculus here because this decision of another district court did not establish controlling law.  <u>Cf.</u> <u>Apotex, Inc. v. FDA</u>, 393 F.3d 210, 218 (D.C. Cir. 2004) (holding that a non-binding district court decision was not a change in law sufficient to overcome res judicata).[5]

The critical question thus becomes whether the conclusion that <u>CLC II</u> did not change existing law but simply cleared up confusion among the district courts ends all debate over whether this exception to issue preclusion applies here.  Unfortunately, the law on what counts as

---

[5]  With that said, the decision in <u>Free Speech for People v. FEC</u>, 442 F. Supp. 335 (D.D.C. 2020), can be read as aligning with <u>CLC II</u>'s interpretation of <u>Wertheimer</u> because the court assured itself that all expenditures had been reported in some form before concluding that the plaintiffs lacked standing, <u>id.</u> at 343–44.  <u>But see</u> <u>CLC I</u>, 507 F. Supp. 3d at 86 (reading <u>Free Speech</u> as supporting its own interpretation of <u>Wertheimer</u>).

a sufficient change to vitiate a prior judgment's preclusive effect is murky.  When introducing this concept in <u>Commissioner of Internal Revenue v. Sunnen</u>, 333 U.S. 591 (1948), the Supreme Court described the necessary shift as "a judicial declaration intervening between the two proceedings [that] so change[s] the legal *atmosphere* as to render the rule of collateral estoppel inapplicable," <u>id.</u> at 600 (emphasis added).  This would appear to be a relatively relaxed standard.  But in more recent opinions, the Supreme Court has required an "intervening change in the applicable legal *context*," <u>Herrera v. Wyoming</u>, 139 S. Ct. 1686, 1697 (2019) (emphasis added and cleaned up), or even a "significant change[] in controlling . . . legal *principles*," <u>Montana v. United States</u>, 440 U.S. 147, 157 (1979) (emphasis added); <u>accord</u> <u>Canonsburg Gen. Hosp.</u>, 807 F.3d at 306 (requiring an "intervening change in controlling legal principles" (cleaned up)).  These divergent descriptors reflect an underlying uncertainty on what is required to free a party from the bonds of issue preclusion.  The Supreme Court in <u>Herrera</u> recognized that "it may be difficult at the margins to discern whether a particular legal shift warrants an exception to issue preclusion," 139 S. Ct. at 1698, with Justice Alito adding that the Court has never "defined how much the relevant 'legal context' must change in order for the exception to apply" and warning that an overly broad definition "could dangerously undermine the important interests served by issue preclusion," <u>id.</u> at 1707–08 (Alito, J., dissenting).  As a result, while an outright reversal or explicit abrogation of prior binding precedent is clearly an adequate shift in the legal landscape, <u>see, e.g.</u>, <u>id.</u> at 1698, it is not always apparent what else suffices for a change in the legal landscape to nullify a prior ruling's preclusive effect.

Some courts have treated clarifications resolving confusion among the lower courts as a sufficient change in the "legal atmosphere," latching onto <u>Sunnen</u>'s broad terminology.  <u>See, e.g.</u>, <u>Keyes v. Lynch</u>, 214 F. Supp. 3d 267, 276 (M.D. Pa. 2016); <u>see also</u> <u>Minnis v. U.S. Dep't</u>

of Agric., 737 F.2d 784, 786 n.1 (9th Cir. 1984) ("It has long been the rule in this circuit that an intervening Supreme Court decision clarifying an issue that had been uncertain in the lower courts defeats collateral estoppel.").  But such a capacious view of the required change in the law risks having the exception swallow the rule, as issue preclusion is supposed to apply even to decisions that misconstrue controlling law.  See Canonsburg Gen. Hosp., 807 F.3d at 306. Likely for that reason, most courts have pared back Sunnen's more expansive language by requiring that the intervening decision effectively overrule or otherwise nullify some prior precedent.  See, e.g., Am. Med. Int'l, Inc. v. Sec'y of Health, Ed. & Welfare, 677 F.2d 118, 120 (D.C. Cir. 1981) (noting Sunnen has been limited to cases where there is a "significant change in the legal climate" in the form of a change in controlling legal principles (quotation marks omitted)); Kamilche Co. v. United States, 53 F.3d 1059, 1062 n.3 (9th Cir. 1995) (noting that "Sunnen's scope has been substantially narrowed by the Supreme Court " (quotation marks omitted)); Feit Elec. Co., Inc. v. CFL Techs. LLC, 800 F. App'x 911, 912 (Fed. Cir. 2020) (rejecting "a version of the change-in-law exception so broad that it would deny preclusion based on judicial decisions that merely clarify earlier interpretations of a statute" (quotation marks omitted)).  Applying this more stringent standard, circuit courts have rejected attempts to skirt issue preclusion where, as here, a party points to an intervening decision that purported to reiterate and apply (not overturn or alter) existing law.  See, e.g., United States v. Arterbury, 961 F.3d 1095, 1104 (10th Cir. 2020); Steen v. John Hancock Mut. Life Ins. Co., 106 F.3d 904, 914 (9th Cir. 1997); Paulo v. Holder, 669 F.3d 911, 918–19 (9th Cir. 2011).  The Court follows that prevailing approach here and finds that CLC II's clarification of Wertheimer does not constitute a significant enough change in the legal landscape to undermine the preclusive effect of its prior decisions in RTR I and RTR II.

In doing so, the Court finds no "basic unfairness" in holding Plaintiffs to those prior judgments (even if wrongly decided) because Plaintiffs had their chance to take advantage of CLC II's clarification and thereby nullify RTR I and RTR II but, for whatever reason, passed on that opportunity. CLC II was handed down while a motion for reconsideration was pending before this Court and before the window to appeal had elapsed. Plaintiffs were well aware of this development. After all, Campaign Legal Center was a party in both suits and Plaintiffs alerted the Court to the ruling in a notice of supplemental authority. As described above, the Court declined to consider the new decision because Plaintiffs never requested reconsideration of its ruling on their informational injury. But the Court informed Plaintiffs that they were "free to raise this argument on appeal." RTR III at 11. Plaintiffs decided not to exercise this right, opting to leave the Court's rulings in place. That sets the present case apart from the normal circumstance where this exception is applied because Plaintiffs could have benefited from the purported intervening change in the original proceeding. Cf. Voter Verified, Inc. v. Election Sys. & Software LLC, 887 F.3d 1376, 1381–82 (Fed. Cir. 2018) (finding no "intervening" change because the new decision was decided while appeal of the first case was still pending).

Plaintiffs perhaps felt that an appeal was not worthwhile because the FEC mooted their delay case by dismissing their complaints on August 29, 2022, two weeks before the deadline to appeal. See Opp'n at 24 & n.6. This argument runs into a second possible reason to alleviate a party from the preclusive effect of a prior judgment—namely, that the party lacked a sufficient incentive to litigate the matter. Here, the argument would be that, while Plaintiffs were initially motivated to push their informational standing before this Court, any such incentive evaporated before appellate proceedings began when the Commission mooted their delay case. That might be a winning argument in the lion's share of jurisdictions that do not require a party to pursue

vacatur of an already moot decision on appeal.  See Hurd v. District of Columbia, 864 F.3d 671, 680 (D.C. Cir. 2017) (noting the general rule that "when the earlier 'controversy has become moot' on appeal, the unreviewed lower court judgment cannot have preclusive effect" (quoting Restatement (Second) of Judgments § 28 cmt. a)).  But the federal courts play by a different set of rules.  Under United States v. Munsingwear, Inc., 340 U.S. 36 (1950), a judgment that is rendered unreviewable before the conclusion of appellate proceedings is accorded full preclusive effect unless a party requests the appellate court to dismiss the case with instructions to vacate the judgment below.  See Restatement (Second) of Judgments § 28; 18 Charles A. Wright & Arthur Miller, Federal Practice and Procedure § 4433 (2023) ("[I]t is settled that if the parties fail to request [an order vacating the judgment] and the appellate court merely dismisses the appeal, the judgment of the trial court continues to command preclusive effects.").  Had Plaintiffs done so in the delay case, the Circuit would have followed this "standard practice" and this entire issue could have been avoided.  Planned Parenthood of Wisc., Inc. v. Azar, 942 F.3d 512, 519 (D.C. Cir. 2019).  "The case is therefore one where [Plaintiffs], having slept on [their] rights," now request that the Court "do what by orderly procedure it could have done for itself." Munsingwear, 340 U.S. at 40.  But, as in Munsingwear, that ship has sailed.  Plaintiffs are now stuck with the consequences of their (in)actions.

In a final attempt to avoid this result, Plaintiffs maintain that even if controlling law has not changed since the delay case, the existence of new material facts triggers the "curable defect" exception to issue preclusion.  This exception permits relitigation of jurisdictional claims that would normally be barred by issue preclusion in the limited set of cases where a plaintiff can demonstrate that "a precondition requisite to the court's proceeding with the original suit was not alleged or proven, and is supplied in the second suit."  Nat'l Ass'n of Home Builders, 786 F.3d at

41 (cleaned up).  In particular, the plaintiff must be able to identify "occurrences subsequent to the original dismissal that remedy the jurisdictional deficiency."  Id. (cleaned up). The claims of informational injury in this case do not squeeze through this narrow exception.

Plaintiffs contend that the Commission's dismissal of their administrative complaints and ensuing release of the MURs, including the Office of General Counsel's findings, provided them with the facts they need to assert an informational injury concerning allegedly undisclosed testing-the-waters expenditures.  See Opp'n at 25–26, 33–34.  In making this argument, Plaintiffs contend that they "can now identify from the recently-released public case file several additional Bush campaign events that his campaign failed to report."  Id. at 33.  But this reasoning has two fatal flaws.  First, the Court held in RTR II that Plaintiffs lacked informational injury so long as either the Bush campaign or Right to Rise has released the requested information in some form. See 578 F. Supp. 3d at 5–6.  Because Right to Rise already had reported costs for all five of the purported testing-the-waters events that Plaintiffs identified, the Court concluded that Plaintiffs had not alleged an informational injury.  Id.  Plaintiffs do not demonstrate that the MURs "cure" this defect, as they simply contend that "there is no way to ascertain whether [Right to Rise's] undesignated disbursements for 'travel' or related purposes covered these outstanding events." Opp'n at 34.  But just as such speculation about unreported testing-the-waters expenditures did not suffice in RTR II, it does not cut it here.  Second, and more fundamentally, Plaintiffs fail to explain why they were unable to identify these alleged testing-the-waters events in the delay case when the Court afforded them ample opportunities to do so, dedicating an entire round of briefing and a hearing to this issue.  See RTR II, 578 F. Supp. 3d at 5–7.  Their failure to highlight this information is all the more puzzling considering that the Office of General Counsel apparently identified that these were campaign events by reviewing CSPAN footage and other

materials in the public domain.[6]  See Reply at 17–18.  It is thus not that this information *couldn't*

be discovered but that Plaintiffs simply *didn't* discover it when given the opportunity.  That is no

reason to excuse Plaintiffs from issue preclusion; it is the reason issue preclusion exists.

 The Court may have erred in RTR I and RTR II, but it took two to tango.  Plaintiffs put

themselves in this predicament when they failed to push their claims of informational standing to

the hilt in the prior case by neither discovering materials in the public record nor appealing and

seeking vacatur once CLC II revealed this Court's errors.  Those prior litigation miscues leave

the Court with no choice but to conclude that Plaintiffs are precluded from relitigating this theory

of standing in the present action.

 B.  Organizational Standing

 With informational standing off the table, the Court now turns its attention to Plaintiffs'

assertion of organizational standing.  An organization suing on its own behalf "must establish

concrete and demonstrable injury to the organization's activities—with a consequent drain on the

organization's resources—constituting more than simply a setback to the organization's abstract

social interests."  Common Cause v. FEC, 108 F.3d 413, 417 (D.C. Cir. 1997) (cleaned up).  In

particular, the plaintiff must first show "that the agency's action or omission to act injured the

organization's interest," and second, the plaintiff must show that it "used its resources to

counteract that harm."  PETA, 797 F.3d at 1094 (cleaned up).  Use of resources in litigation does

not give rise to Article III standing, nor does an organization suffer a concrete injury by

---

 [6]  The Commission makes a more categorical argument when asserting that the Office of
General Counsel's report *must* have been based on public materials because, under 52 U.S.C.
§ 30109(a)(2), the Commission may not investigate until there is a successful reason-to-believe
vote.  Reply at 16–18.  That is not entirely accurate because the Commission can make voluntary
requests for information from the accused—a power that it used in this case.  But that does not
change the fact that most of the relevant information in the MURs was publicly available here.

"expend[ing] resources to educate its members and others unless doing so subjects [it] to operational costs beyond those normally expended."  Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 920 (D.C. Cir. 2015) (cleaned up).  An organization instead must identify expenditures of money or time that are above and beyond those normally incurred in carrying out its advocacy mission.  Id.  At this stage, however, the Court cannot conclusively determine what effect the preclusion analysis above might have on this alternative theory of standing or whether Plaintiffs can demonstrate an ongoing injury that is required for the injunctive relief they seek.

First, regarding issue preclusion, the parties spill most of their ink on the matter debating whether RTR III's finding that Plaintiffs lacked a cognizable organizational injury to challenge the FEC's delay bars the Plaintiffs from contesting the FEC's dismissal of their complaints.  See Reply at 11–14.  But unlike with informational standing, this prior analysis of the organizational injury was cabined to issues unique to the delay suit that do not carry forward here.  The Court in RTR III reasoned that Plaintiffs could not assert an injury to their organizations by claiming they diverted resources to compensate the Commission's failure to release the MURs.  The Court reached this result by noting that (1) the Circuit has held that the Commission's failure to process a complaint is insufficient to confer Article III standing, see RTR III at 5 (citing Common Cause, 108 F.3d at 419); and (2) the FEC cannot release an MUR until it has fully processed a case and closed the file, see id. (citing 52 U.S.C. § 30109(a)(12)(A)).  Stitching these two observations together, the Court found that any diversion of resources stemming from the Commission's nondisclosure of the MURs is not a cognizable injury.  Id. at 5–11.  None of this analysis applies to Plaintiffs' new assertions of organizational injury that derive not from the Commission's refusal to release the MURs but from the Commission's alleged failure to enforce the law to require the Bush campaign and Right to Rise to divulge "required FECA disclosure information

that both plaintiffs need to inform the public about candidates' financial support." Opp'n at 40 (citing Compl. ¶¶ 14–15, 19). RTR III therefore does not preclude Plaintiffs from claiming organizational standing here.

Whether the Court's decisions in RTR I and RTR II undermine Plaintiffs' organizational standing claims, however, is less clear. Plaintiffs' assertion of organizational standing revolves around their claim that the Commission's failure to enforce the FECA is depriving them of mandatory disclosures and forcing them to expend their own resources to compensate for this informational black hole. These arguments are in significant tension with the Court's previous judgments that Plaintiffs did not assert a valid informational injury because they are not entitled to the disclosures that they seek—particularly, the "legal determination" that certain expenditures were coordinated between Right to Rise and the Bush campaign. To be sure, as the Court noted in RTR III, the Circuit's decision in PETA demonstrates that the elements of informational and organizational standing diverge in important respects. See RTR III at 8 n.2 (citing PETA, 797 F.3d at 1092, 1095–96). While a party asserting informational injury must show it is legally entitled to the information, a plaintiff claiming organizational injury need only demonstrate that deprivation of the information impairs its daily operations. Id. This difference may suggest that the Court's finding that Plaintiffs had no legal *right* to the disclosure of coordinated expenditures does not foreclose them from contending that they nonetheless have a weighty *interest* in those disclosures and that the absence of this information has interfered with their programmatic activities. At the same time, however, the Court's categorical language that Plaintiffs have "no legally cognizable interest in labeling spending 'coordinated' if that spending has already been disclosed in some format" may slam shut that door to federal court. RTR I, 520 F. Supp. 3d at 48. Unfortunately, the parties did not delve into these thorny issues in their briefs. Nor did they

touch on whether Plaintiffs might be able to circumvent these challenges by identifying some testing-the-waters expenditures that neither the Bush campaign nor Right to Rise ever disclosed in any fashion—possibly because, as discussed above, Plaintiffs have not pointed to a specific disbursement for any such event that Right to Rise failed to include in its annual reports.

Second, even if Plaintiffs can work around the preclusion issues described above, there is still an open question as to whether they can plausibly allege an ongoing organizational injury all these years after the 2016 presidential campaign has concluded.  In their complaint, Plaintiffs identify themselves as nonpartisan groups committed to strengthening democracy by educating the public and ensuring compliance with campaign-finance laws.  See Compl. ¶¶ 12, 18.  To fulfill this mission, the groups claim they "rel[y] on accurate and complete reporting of campaign finance information."  Id. ¶ 14.  They further allege the Commission's dismissal of their two administrative complaints frustrates that mission by depriving them of "FECA-required information regarding the amounts, dates, and purposes of [Right to Rise's] in-kind contributions to the Bush campaign."  Id. ¶ 23.  Without this information, Plaintiffs maintain they have "had to divert resources from other planned organizational needs to research relevant law and fill in the gaps to the best of their ability, including by explaining to reporters, researchers, and partner organizations how they might attempt to find information not properly reported."  Opp'n at 41–42; see also Compl. ¶¶ 17, 20.  But while that may have been true when Bush was a frontrunner for the White House, it is not self-evident that these organizations are still diverting resources to address questions about a campaign that ended in defeat more than six years ago.  Campaign Legal Center claims "reporters often contact CLC for guidance as to whether or where they can find the campaign finance information that is not being properly reported."  Id. ¶ 17.  But are reporters still dialing CLC's line to ask about Jeb Bush's campaign tabs from 2015?  That, after

all, is what Plaintiffs must demonstrate to prove an ongoing injury that the Court can remedy with the injunctive relief sought.  See City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983).

The Court has its doubts that these calls are still incoming, and thus that the injury is ongoing, but the Commission does not raise this argument in its motion to dismiss because it attacks the assertion of organizational standing only on issue-preclusion grounds.  That oversight cannot carry the day, however, because a court always must assure itself of its own jurisdiction. See, e.g., In re Marin, 956 F.2d 339, 340 (D.C. Cir. 1992).  But, once again, it would be helpful to hear from the parties before reaching out to decide this matter.

Accordingly, because the Commission failed to show RTR III precludes the Plaintiffs' current assertion of an organizational injury, the Court will deny its Rule 12(b)(1) motion at this time.  That dismissal will be without prejudice, however, as the Court still has significant doubts about whether this alternative basis for standing will win out.  The Court therefore invites the FEC to renew its jurisdictional challenge with a subsequent motion to dismiss addressing:

> (1)  Whether RTR I and RTR II have preclusive effect on organizational standing, focusing on PETA's distinction between informational and organizational standing as well as RTR I's statements that Plaintiffs have no legal interest in the disclosure of coordinated expenditures.

> (2)  Whether Plaintiffs can identify testing-the-waters expenditures that neither the Bush campaign nor Right to Rise disclosed in any form, and, if so, whether Plaintiffs may assert an organizational injury stemming from the failure to disclose these activities even if they are precluded from claiming an organizational injury related to the non-disclosure of coordinated expenditures.

> (3)  Whether Plaintiffs plausibly alleged an *ongoing* injury to their organizations that is required for the requested injunctive relief.

Given the multiple challenges facing their purported organizational injuries, Plaintiffs are free to inform the Court whether they wish to forgo a further motion to dismiss by dropping this theory of standing.  Doing so would allow Plaintiffs to immediately appeal the Court's determination

that they are precluded from claiming informational standing or, alternatively, put to rest their challenges to the election activities of a campaign that wrapped up over a half decade ago.

C.  Futility

Given that the Court is unsure of its jurisdiction to consider this matter, it is premature to adjudicate the Commission's futility argument at this juncture.  But seeing that another motion to dismiss is possibly on the menu, some table setting is in order.

As the Commission notes, a district court "may forego the futile gesture of remand to the agency" where "the outcome of a new administrative proceeding is preordained."  Berge v. United States, 949 F. Supp. 2d 36, 43 (D.D.C. 2013) (citation omitted).  This is a narrow exception, however, that is reserved for the rare cases in which there is "only one rational course" for an agency to follow.  Id.  While this standard is satisfied when the agency's decision is "legally inevitable," Fogg v. Ashcroft, 254 F.3d 103, 111 (D.C. Cir. 2001), the doctrine does not give courts free range to guess which of multiple possible options an agency is most likely to follow and refuse to remand based on that hunch.  Much of the Commission's futility argument, including that a cadre of three Commissioners has expressed limited appetite in reconsidering Plaintiffs' administrative complaint, sounds in this impermissible guessing game.  See, e.g., End Citizens United PAC v. FEC, 69 F.4th 916, 922–23 (D.C. Cir. 2023) ("[T]he Supreme Court has contemplated that 'a reviewing court . . . will set aside' Commission action taken contrary to law and 'remand the case,' even though the Commission might later 'reach the same result exercising its discretionary powers lawfully.'" (quoting Akins, 524 U.S. at 25)).

The sole exception is the Commission's vague suggestions the limitations period might foreclose any further action in this matter, but it is unclear what the Court should make of these gestures to the claims being time-barred.  The FEC repeatedly asserts that the abovementioned

group of three Commissioners "expressed concerns related to the statute of limitations," Mot.

Dismiss at 20 (citing Dickerson Statement at 7–9), referring to the five-year limitations that 28

U.S.C. § 2462 imposes on "any civil fine, penalty, or forfeiture, pecuniary or otherwise."  Yet

these Commissioners' "concerns"—even if stated in more definite terms—do not constitute the

official position of the agency, as the Commission acknowledges that "the sole Statement of

Reasons ('SOR') that controls as the explanation for the Commission's actions in this case was

issued by Commissioner Weintraub in September of 2022."  Reply at 22.  And in its briefing, the

Commission conspicuously declines to commit itself to whether it believes § 2462 applies to the

injunctive actions Plaintiffs are requesting from the FEC here.  That may be because, from what

the Court can divine, the law appears unsettled on this issue.  Some courts in this District have

held that while "28 U.S.C. § 2462 may protect [parties] from being assessed a civil fine, penalty

or forfeiture for conduct in violation of the FECA that occurred five years before the Complaint

was filed, this general statute of limitation provides no such shield from declaratory or injunctive

relief."  FEC v. Christian Coal., 965 F. Supp. 66, 71 (D.D.C. 1997); accord FEC v. Nat'l

Republican Senatorial Comm., 877 F. Supp. 15, 21 (D.D.C. 1995).  Yet other courts within this

District and beyond have come to the opposite conclusion.  See, e.g., FEC v. Nat'l Right to Work

Comm., 916 F. Supp. 10, 14–15 (D.D.C. 1996); FEC v. Williams, 104 F.3d 237, 240 (9th Cir.

1996).  Without a clearer argument or more concrete position from the Commission, then, the

Court is not inclined to conclude that the result on remand is "legally inevitable."  Fogg, 254

F.3d at 111.

Thus, if the Commission seeks to renew its futility argument in any further motion to

dismiss, it is invited to clarify its position on how the five-year statute of limitations applies to

this case.

**IV.   Conclusion**

For these reasons, it is hereby

**ORDERED** that [Dkt. No. 12] the Federal Election Commission's Motion to Dismiss is

DENIED without prejudice to renewal.

**SO ORDERED**.


 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>September 26, 2023</u>