## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAMPAIGN LEGAL CENTER,** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**FEDERAL ELECTION COMMISSION**,<br><br>Defendant. | Case No. 22-cv-3319 (CRC) |

## <u>MEMORANDUM OPINION</u>

In early 2015, former Florida Governor Jeb Bush was the presumptive favorite to become the next Republican nominee for president.  Six months before Governor Bush officially declared his candidacy, a political action group ("PAC") called Right to Rise had raised north of $100 million to support his campaign.  Flush with cash, Governor Bush appeared well on his way to securing the nomination and potentially becoming the third member of his family to sit behind the Resolute Desk.  One year later though, after disappointing showings in Iowa and New Hampshire, Governor Bush called it quits and suspended his campaign.

The same cannot be said of Plaintiffs Campaign Legal Center and Democracy 21, who continue to pursue a longstanding dispute about Governor Bush's unsuccessful presidential bid despite several stumbles in gaining a foothold in federal court.  During the early stages of the campaign, Plaintiffs filed two administrative complaints with the Federal Election Commission ("FEC" or "Commission") claiming that Governor Bush and Right to Rise violated the Federal Election Campaign Act ("FECA"), <u>see</u> 52 U.S.C. § 30101 et seq.  Plaintiffs alleged that Governor Bush and Right to Rise had coordinated their efforts, thereby violating the applicable contribution limits and disclosure requirements, and failed to report "testing the waters" expenditures before Bush officially launched his candidacy.  After the complaints sat dormant

before the Commission for nearly five years, Plaintiffs filed suit in this Court, contending that the lengthy delay was contrary to law.  The Court did not reach the merits of this charge, finding instead that Plaintiffs lacked standing to pursue their claims because they had not established an informational injury or any other constitutionally sufficient basis to sue.

After the Commission ended the administrative limbo by closing the file on these complaints, Plaintiffs returned to this Court with a new suit challenging the dismissal.  The Commission objected, arguing that this Court's judgment that Plaintiffs lacked standing to pursue their prior case precludes them from bringing another action based on the same underlying facts.  In a September 2023 Memorandum Opinion, the Court agreed that the doctrine of issue preclusion bars Plaintiffs from a second crack at alleging informational injury.  At the same time, although expressing serious doubts about Plaintiffs' alternative invocation of "organizational standing" to pursue this action, the Court determined that the parties had not adequately addressed that argument.  The Court accordingly invited the Commission to renew its jurisdictional challenge in a subsequent motion to dismiss if Plaintiffs decided to soldier forward with that basis for standing.  Refusing to throw in the towel, Plaintiffs stood by their assertion of organizational standing, and the Commission filed a fresh motion to dismiss.

Having reviewed the parties' new round of briefs, the Court now finds that Plaintiffs lack organizational standing to pursue this action.  The Court will therefore dismiss this action and (perhaps) finally put to rest this protracted dispute that has lived through three presidential election cycles.

## I.  Background

The Court recounted the lengthy procedural and legal background in its prior opinion, so it provides only a summary of the relevant details here.  See Mem. Op. & Order, Campaign Legal Ctr. v. FEC ("RTR IV"), No. 22-cv-3319 (CRC) (Sept. 15, 2023), ECF No. 23.

In 2015, Plaintiffs filed an administrative complaint with the FEC alleging that former Florida Governor Jeb Bush violated the FECA through his extensive interactions with the Right to Rise Super PAC during his then-ongoing presidential bid.  Specifically, Plaintiffs asserted that Governor Bush had unlawfully delayed registering as a candidate in the presidential race, failed to disclose "testing the waters" expenditures, and illegally funded his unofficial candidacy with "soft money" contributions from Right to Rise that evaded FECA limitations.  See Compl. ¶ 3. Several months later, Plaintiffs supplemented their administrative complaint by adding charges that Bush had violated 52 U.S.C. § 30125(e) when he "establish[ed]" and "controll[ed]" Right to Rise as a ruse to raise millions of dollars for his campaign without regard for the FECA's contribution limits or source prohibitions.  See id. ¶ 4.

After their administrative complaint languished for almost five years, Plaintiffs filed a petition in this Court in March 2020 arguing that the Commission's failure to act was contrary to law under 52 U.S.C. § 30109(a)(8)(A).  See Campaign Legal Ctr. v. FEC ("RTR I"), 520 F. Supp. 3d 38, 41–42 (D.D.C. 2021).  In this "delay" case, Plaintiffs asserted two injuries that they claimed were sufficient to confer Article III standing.  First, they alleged that the Commission's inaction had resulted in a cognizable *informational* injury because the FECA entitled them to know "the extent of coordination between Right to Rise and the Bush campaign" as well as "the extent of Bush's campaign spending both during the testing the waters phase of his campaign and after Bush had moved beyond testing the waters to become a candidate under the FECA."

Id. at 42 (cleaned up).  Second, Plaintiffs claimed they had suffered *organizational* injuries due to the Commission's inaction because the failure to close the administrative file and release the Commission's underlying records forced them to divert resources and efforts away from other organizational needs.  Id.  After the Commission did not appear through counsel to defend itself, Right to Rise successfully intervened and moved to dismiss all claims for lack of standing.  Id.

The Court initially issued a split decision on informational standing.  It held that Plaintiffs had adequately alleged informational injury based on Bush's purported failure to report testing-the-waters activities but failed to do so when it came to the allegations of coordinated spending between the Bush campaign and Right to Rise.  RTR I, 520 F. Supp. 3d at 46–48. Relying on Wertheimer v. FEC, 268 F.3d 1070 (D.C. Cir. 2001), the Court held that Plaintiffs had no legally cognizable interest in a legal determination that some of Right to Rise's purportedly independent expenditures were actually "coordinated" in-kind contributions.  Id. at 47–48.  The Court was in good company in reaching this result.  Other courts in this District faced with the same question had resolved that plaintiffs lack Article III standing to seek what amounts to a "legal conclusion that carries certain law enforcement consequences."  See Campaign Legal Ctr. v. FEC ("Clinton II"), 507 F. Supp. 3d 79, 85–86 (D.D.C. 2020) (quoting Wertheimer, 268 F.3d at 1075).  Nonetheless, the case was set to proceed because the Court found that Plaintiffs had alleged a valid informational injury related to purportedly unreported testing-the-waters activities between January and June of 2015.  RTR I, 520 F. Supp. 3d at 45. Taking this allegation as true, it appeared Plaintiffs had been deprived of "five months of information that is statutorily required to be disclosed" and that would aid them in their missions to safeguard elections—a textbook informational injury.  Id. at 46.

That changed when Right to Rise filed a motion for reconsideration belatedly arguing that all expenditures during this five-month period already had been disclosed in some form either in Governor Bush's first campaign finance report or in Right to Rise's disclosure reports. Campaign Legal Ctr. v. FEC ("RTR II"), 578 F. Supp. 3d 1, 5–6 (D.D.C. 2021).  Plaintiffs had identified five public appearances for which they maintained Bush had not reported travel and lodging expenses, id. at 5.  An additional round of briefing and a hearing, however, revealed that these expenditures were already in the public record.  Id. at 6–7.  Before granting the motion for reconsideration and dismissing the case, the Court noted that whether this pattern of spending violated the FECA's soft-money prohibition did not change the standing analysis because the Court already had decided that "plaintiffs are not entitled to a legal conclusion that carries certain law enforcement consequences."  Id. at 6 n.4 (cleaned up).

Plaintiffs then filed their own motion for reconsideration, asking the Court to clarify its ruling on their organizational standing based on the FEC's delay in acting on their administrative complaints and the Commission's failure to release its Matter Under Review ("MUR") file detailing its internal deliberations and findings.  While that motion was pending, Plaintiffs also filed a notice of supplemental authority alerting the Court to the D.C. Circuit's decision in Campaign Legal Center v. FEC ("Clinton III"), 31 F.4th 781 (D.C. Cir. 2022).  Clinton III reversed Clinton II, holding that the plaintiffs had suffered an informational injury based on the nondisclosure of whether certain super PAC expenditures were "coordinated" with the Clinton campaign.  Id. at 792–93.  Plaintiffs contended that this supplemental authority "controverts the Court's holding that plaintiffs did not suffer informational injury" based on the Bush campaign's and Right to Rise's method of reporting Bush's testing-the-water activity.  Pls.' Notice of Suppl. Auth., Campaign Legal Ctr. v. FEC, No. 20-cv-730 (CRC), ECF No. 37, at 4–5.

The Court denied this second request for reconsideration.  On the claimed organizational injury, the Court held that this alternative basis for standing failed because established precedent made clear that the Commission's failure to process complaints in a timely manner did not confer Article III standing.  See Mem. Op. & Order, Campaign Legal Ctr. v. FEC ("RTR III"), No. 20-cv-730 (CRC) (July 14, 2022), ECF No. 39, at 5.  The Court also acknowledged Plaintiffs' notice of supplemental authority but found that Clinton III was relevant only to Plaintiffs' "first theory of standing—informational injury—which they specifically did not challenge in the present motion for reconsideration."  Id. at 11.  The Court, accordingly, held that Clinton III was beyond the scope of the present motion but informed Plaintiffs they were "free to raise this argument on appeal."  Id.  Plaintiffs decided to stand pat, however, as the period to appeal elapsed on September 12, 2022.

Around that same time, the Commission finally acted by voting 4-1 to dismiss Plaintiffs' administrative complaints.  Pursuant to Commission policy, documents related to this case were placed on the public record 30 days after the closure vote.  See Disclosure of Certain Documents in Enforcement and Other Matters, 81 Fed. Reg. 50,702 (Aug. 2, 2016).

Those records revealed that, in February 2017, the Commission's Office of General Counsel had recommended the Commission find reason to believe that (1) Governor Bush failed to timely register as a candidate; (2) the Bush campaign received unreported, excessive in-kind contributions from Right to Rise; and (3) Bush and Right to Rise had violated the FECA's soft-money restrictions because Bush effectively had established or controlled the PAC.  See FEC, First General Counsel's Report 4–5, MURs 6915 & 6927 (Feb. 8, 2017) ("First General Counsel's Report").[1]  In doing so, the report detailed Right to Rise's funding of Governor Bush's

---

[1]  Available at https://www.fec.gov/files/legal/murs/6927/6927_14.pdf.

travel expenses related to what should have been characterized as campaign events.  Id.  Despite these recommendations, the Commission deadlocked 2-2 on this trio of charges in December 2018 with then-Commissioners Hunter and Petersen dissenting.  Compl. ¶ 85.  When the Commission held a second vote one week later on a pruned set of claims that abandoned the alleged soft-money violations, it deadlocked again—this time with Commissioners Walther and Weintraub in dissent.  Id. ¶ 86.  These deadlocked reason-to-believe votes were followed by repeated rounds of failed efforts to close the administrative file, and thus formally dismiss the complaints, over the next three years.  Id.  In the interim, there was significant churn among the FEC members.  In May 2022, three of the new members drafted a "Statement of Reasons" explaining their votes to close the file that Spring.  See Statement of Reasons of Chairman Allen Dickerson and Comm'rs Sean J. Cooksey and James E. "Trey" Trainor, III, MURs 6915 & 6927 (May 13, 2022) ("Dickerson Statement").[2]  Declining to take a position on the merits of the initial reason-to-believe vote, these Commissioners maintained that the failure to secure four affirmative votes in 2018 effectively terminated any proceeding based on the original complaint and that the "five-year statute of limitations ha[d] long passed" on considering the charges.  Id. at 5 & n.28 (citing 52 U.S.C. §§ 30145(a), 2462).

These Commissioners did not speak for the agency, however, and an official statement did not come until one month after the FEC finally voted to close the file when Commissioner Weintraub—who was part of the controlling block that prevented the trimmed charges from going forward—issued her own Statement of Reasons.  See Mot. Dismiss, ECF No. 12, at 10 (noting that Weintraub's "statement provides the rationale for the Commission for purposes of judicial review for those claims").  Rather than mount a substantive defense of the dismissal or

---

[2]  Available at https://www.fec.gov/files/legal/murs/6927/6927_26.pdf.

assert prosecutorial discretion, Weintraub criticized the Commission for turning a blind eye to the well-documented allegations that Bush and Right to Rise used soft money to advance Bush's presidential campaign.  Statement of Reasons of Comm'r Ellen L. Weintraub, MURs 6915 & 6927 (Sept. 30, 2022).[3]  She concluded her Statement by expressing her hope that the Plaintiffs would petition for judicial review and that the courts would break through the partisan gridlock.

Plaintiffs picked up the baton.  Two months later, they returned to this Court alleging that the FEC's dismissal without an investigation violated 52 U.S.C. § 30109(a)(8)(A).  Echoing their prior complaint, these election watchdogs claimed the Commission's dismissal inflicted two harms on their groups: (1) an informational injury by depriving them of FECA-required disclosures related to Bush's testing-the-waters activities and coordinated expenditures with Right to Rise; and (2) an organizational injury by forcing them to divert resources from their regular activities relating to governmental transparency and accountability to "fill in the gaps" in the public record and respond to press requests concerning the Bush campaign.  See Compl. ¶¶ 12–20.

This time, the FEC entered an appearance and promptly moved to dismiss the case under Federal Rule of Civil Procedure 12(b)(1) on the ground that the Court's prior determination that Plaintiffs lacked standing in the unlawful-delay case precludes them from relitigating that issue in this renewed action based on the same underlying facts.[4]  In a September 2023 Memorandum Opinion, the Court agreed that the doctrine of issue preclusion barred Plaintiffs from re-alleging

---

[3]  Available at https://www.fec.gov/files/legal/murs/6927/6927_27.pdf.

[4]  The Commission alternatively moved to dismiss all claims under Rule 12(b)(6) arguing that, even if the Court had jurisdiction, the requested remand to the agency would be futile given that "three Commissioners have indicated that they view the matter as long settled and expressed concerns related to the statute of limitations."  Mot. Dismiss, ECF No. 12, at 20.

an informational injury in this case.  RTR IV at 14.  Turning to the alleged organizational injury, the Court noted that its previous holding that Plaintiffs lacked organizational standing in the delay case did not resolve the issue because the basis for the organizational injury differed markedly.  See id. at 26–27.  That did not get Plaintiffs home, however, because the Court identified other "significant hurdles to this alternative basis for standing that the parties did not confront in their briefings."  Id. at 2.  Though neither side addressed the matter in the first round of briefing, the Court observed that its "prior judgments concerning informational injury [may] spill over and contaminate the organizational injury asserted" in this action because those decisions were built on the categorical finding that Plaintiffs have "no legally cognizable interest in labeling spending 'coordinated' if that spending has already been disclosed in some format."  Id. at 2, 27 (quoting RTR I, 520 F. Supp. 3d at 48).  The Court also expressed doubt as to whether Plaintiffs had "plausibly allege[d] an *ongoing* organizational injury all these years after the 2016 presidential campaign has concluded."  Id. at 28 (emphasis added).  Because the parties had not adequately aerated these matters, the Court denied the FEC's motion to dismiss without prejudice to renewal and "invite[d] the FEC to renew its jurisdictional challenge with a subsequent motion to dismiss" addressing the issues the Court raised.  Id. at 2, 29.

The FEC accepted the invitation with a renewed motion to dismiss Plaintiffs' complaint in its entirety for lack of organizational standing.  Having reviewed the parties' briefs, the Court now will decide the issue on which it previously reserved judgment.

## II.   Legal Standards

When analyzing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, courts must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the

facts alleged." <u>Am. Nat'l Ins. Co. v. FDIC</u>, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up). That said, courts need not accept bare legal conclusions nor unsupported inferences. <u>See, e.g.</u>, <u>Browning v. Clinton</u>, 292 F.3d 235, 242 (D.C. Cir. 2002). To overcome a Rule 12(b)(1) motion, plaintiffs must show "by a preponderance of the evidence that the Court has subject matter jurisdiction to hear [the] case." <u>Biton v. Palestinian Interim Self-Gov't Auth.</u>, 310 F. Supp. 2d 172, 176 (D.D.C. 2004).

Organizations can satisfy Article III standing in one of two ways. They can sue either on their own behalf ("organizational standing") or on behalf of their members ("representational standing"). <u>See Abigail All. for Better Access to Developmental Drugs v. Eschenbach</u>, 469 F.3d 129, 132 (D.C. Cir. 2006). Plaintiffs invoke only the former, sometimes referred to as "<u>Havens</u> standing" after the Supreme Court's decision in <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363 (1981). To establish standing under this route, they must show that their organizations, just like any other plaintiff, satisfy the three familiar elements of standing—(1) injury, (2) causation, and (3) redressability. <u>See Equal Rights Ctr. v. Post Props.</u>, 633 F.3d 1136, 1138 (D.C. Cir. 2011).

The D.C. Circuit has crafted a two-step test for determining whether an organization's asserted injury is concrete and demonstrable or merely a setback to its abstract social interests: The group must first show "that the agency's action or omission to act injured the organization's interest," and second, the plaintiff must show that it "used its resources to counteract that harm." <u>People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.</u> ("<u>PETA</u>"), 797 F.3d 1087, 1094 (D.C. Cir. 2015) (citation omitted).

On the first prong, the organization must allege a "concrete and demonstrable injury to [its] activities." <u>Food & Water Watch, Inc. v. Vilsack</u>, 808 F.3d 905, 919 (D.C. Cir. 2015) (alteration in original). "[A] mere 'interest in a problem,' no matter how longstanding the

interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved'" for standing purposes.  Sierra Club v. Morton, 405 U.S. 727, 739 (1972).  Organizations cannot, therefore, establish standing when they seek only to "vindicate their own value preferences through the judicial process."  Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent. Inc., 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting Sierra Club v. Morton, 405 U.S. 727, 740 (1972)).  The challenged activity instead must "perceptibly impair[] the organization's ability to provide services."  Food & Water Watch, 808 F.3d at 919.  A court's task is to differentiate between "organizations that allege that their *activities* have been impeded"—which suffices for standing purposes —"from those that merely allege that their *mission* has been compromised"—which does not.  Citizens for Resp. & Ethics in Washington v. U.S. Off. of Special Couns. ("CREW"), 480 F. Supp. 3d 118, 127–28 (D.D.C. 2020) (emphasis in original) (quoting Abigail All., 469 F.3d at 133).

The second prong asks "whether the organization used its resources to counteract that harm."  Food & Water Watch, 808 F.3d at 919.  Not all expenditures of resources count though.  For one, resources spent educating the public or the organization's members cannot establish Article III injury "unless doing so subjects the organization to 'operational costs beyond those normally expended.'"  Id. at 920 (quoting Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1434 (D.C. Cir. 1995)).  "[T]he devotion of resources to advocacy for the organization's preferred policy—whether that advocacy is directed at Congress, the courts, or an administrative agency—falls short of the line."  Ctr. for Responsible Sci. v. Gottlieb, 346 F. Supp. 3d 29, 37 (D.D.C. 2018).  Similarly, resources spent on, or in anticipation of, litigation cannot establish injury.  See Food & Water Watch, 808 F.3d at 919.  That is because these injuries are "self-inflicted" and thus insufficient for Article III purposes.  See, e.g., Abigail All., 469 F.3d at 133.

At the same time, the Circuit has made clear that an injury is not a "self-inflicted . . . budgetary choice[]" merely by having been made willfully or voluntarily.  Equal Rights Ctr., 633 F.3d at 1139 (quoting Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276 (D.C. Cir. 1994)).  Rather, as long as the organization has expended resources "to counteract, the effects of the defendant['s]" challenged conduct, that diversion can suffice for Article III purposes.  Id. at 1140.

"Putting this all together, then, an organization seeking to bring a case in its own right must first allege that the challenged conduct perceptibly impairs its activities, as opposed to merely frustrating its mission.  It then must show that it expended resources—beyond those normally carried out to advance such mission and excluding 'self-inflicted' expenditures—to address that impairment."  CREW, 480 F. Supp. 3d at 128.  As this test makes clear, standing does not exist whenever "an organization diverts its resources in response to a defendant's actions."  FDA v. All. for Hippocratic Med., 602 U.S. 367, 395 (2024).   Rather, as the Supreme Court recently reiterated, "Havens was an unusual case, and this Court has been careful not to extend the Havens holding beyond its context."  Id. at 396.  With that guidance in mind, the Court now turns to Plaintiffs' assertions of organizational standing in this case.

**III.  Analysis**

Plaintiffs acknowledge the awkwardness of their claims for organizational standing when admitting that "[o]rganizational injury is not [their] preferred basis for arguing standing."  Opp'n, ECF No. 28, at 2.  They nevertheless posit three theories for why their organizations have been injured by the FEC's dismissal of their administrative complaints: (1) they have been harmed by the failure to disclose information regarding the Bush campaign's alleged coordination with Right to Rise; (2) they have an interest in learning about testing-the-waters

expenditures that may never have been reported by the Bush Campaign or Right to Rise in any format; and (3) they have a cognizable interest in a reasoned explanation for why the Commission declined to pursue this case against Bush and Right to Rise, which would inform their core election-watchdog efforts going forward.  None of these theories provides a viable path to federal court.

A.  Coordinated Expenditures

Plaintiffs first contend that they have an organizational interest in learning about the extent of coordination between the Bush campaign and Right to Rise in the 2016 presidential race.  They say the Commission's failure to enforce the FECA deprives them of mandatory disclosures and forces them to expend valuable resources to compensate for this informational black hole.  Yet this route into federal court is largely blocked by this Court's prior decisions that Plaintiffs have no cognizable legal interest in discovering which expenditures were coordinated. And even if not precluded from raising this theory of standing, Plaintiffs have not plausibly alleged that they are still suffering an ongoing organizational injury all these years after the 2016 presidential campaign's curtain call.

1.  *Preclusion*

Before getting to the merits, this assertion of organizational standing fails to clear the first hurdle of issue preclusion.  Issue preclusion applies when (1) "the same issue now being raised [has] been contested by the parties and submitted for judicial determination in the prior case"; (2) "the issue [has] been actually and necessarily determined by a court of competent jurisdiction in that prior case"; and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination."  Martin v. Dep't of Justice, 488 F.3d 446, 454 (D.C. Cir. 2007).  In its prior opinion, the Court recognized that it had not tackled Plaintiffs' organizational

standing theory in its unlawful delay case and noted that "the elements of informational and organizational standing diverge in important respects." RTR IV at 26–27.  At the same time, though, the Court suspected that basing an organizational injury on the failure to disclose "coordinated" expenditures may clash with the Court's "categorical language that Plaintiffs have 'no legally cognizable interest in labeling spending coordinated if that spending has already been disclosed in some format.'"  Id. at 27 (citing RTR I, 520 F. Supp. 3d at 48).  Another round of briefing has revealed that these concerns were warranted.

Courts in this jurisdiction regularly have recognized that claimed organizational injuries predicated on the deprivation of information are "part and parcel of the alleged informational injury" and, accordingly, these two theories rise and fall together.  Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray, 848 F. App'x 428, 431 (D.C. Cir. 2021) (per curiam).  In Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity ("EPIC"), 878 F.3d 371 (D.C. Cir. 2017), for example, the Circuit rejected EPIC's alleged informational injury stemming from the government's failure to produce the requested privacy-impact assessment because "it ha[d] not suffered the type of harm" that Section 208 of the E-Government Act seeks to prevent.  Id. at 378.  The court then dispensed with the plaintiffs' purported organizational standing in short order, noting that these two injuries were not "analytically separate" and holding that "EPIC cannot ground organizational injury on a non-existent interest."  Id. at 379.  Judge Williams echoed this point in his concurrence, explaining that "organizational standing is merely the label assigned to the capacity in which the organization contends it has been harmed; it is not a separate type of injury."  Id. at 404 (Williams, J., concurring).  Thus, although EPIC "ha[d] alleged one harm, packaged as two

theories (perhaps in the hope that such packaging will increase the odds of success)," there was no need for the court "to accept that packaging[.]"  Id.

A fellow court in this District picked up the point three years later in Lawyers' Committee for 9/11 Inquiry, Inc. v. Wray, 424 F. Supp. 3d 26 (D.D.C. 2020).  There, two groups and one individual filed suit seeking an order requiring the FBI to issue a report on evidence regarding the September 11 terrorist attacks.  The court first determined that the plaintiffs lacked an informational injury sufficient to confer standing.  See id. at 33.  Following EPIC's lead, the court then easily determined that the plaintiffs had failed to establish an organizational injury, as well, because it was "part and parcel of the alleged informational injury."  Id.  The Circuit reiterated this reasoning with approval when affirming the dismissal.  See 848 F. App'x at 431. Citing this line of precedent, the Commission contends that Plaintiffs cannot reallege the same informational harm under the new banner of an "organizational injury" because the substance is the same regardless.  No matter the flag it flies under, the result should be the same.  See Mot. Dismiss, ECF No. 27, at 17–18.

The Court tends to agree.  Organizational standing is best conceived not as an entirely separate injury, but rather as a means for groups to vindicate their legal rights and interests, just as any individual person can.  When the asserted injury stems entirely from the deprivation of certain information—here, information concerning which expenditures were "coordinated" with the Bush campaign—any organizational injury predicated on that information should rise and fall with Plaintiffs' informational injury.  Because Plaintiffs are precluded from alleging an informational injury in this action, see RTR IV at 15–25, they appear equally foreclosed from repacking that same injury under the new label of organizational standing.

With that said, as the Court recognized in its prior opinion, there are competing lines of precedent in this Circuit attempting to pull apart organizational and informational injuries.  See RTR IV at 27–28.  In PETA, the Circuit found that animal-rights groups had asserted valid organizational injuries when alleging they were deprived of government reports—even though they lacked any statutory entitlement to the reports that could ground an informational injury.  797 F.3d 1087 at 1095, 1100–01.  This absence of a legal entitlement to the information was not determinative for organizational standing, the Circuit concluded, because a plaintiff claiming organizational injury need only demonstrate that deprivation of the information impairs its daily operations.  See RTR IV at 27 (citing PETA, 797 F.3d at 1092, 1095–96).  Put differently, even if a group lacks a legal *right* to the disclosure of coordinated expenditures that is necessary for informational injury, it may nonetheless have a cognizable legal *interest* in those disclosures when the absence of this information interferes with its programmatic activities.

That arguably strange result, which appears to place organizations on a higher plane than other plaintiffs and permits them to sue even when no individual would have Article III standing to do so, has caused consternation at the Circuit.  See PETA, 797 F.3d at 1104 (Millett, J., dubitante) ("PETA's claim of informational injury should not open the Article III door . . . for one simple reason:  Even as alleged by PETA, there is no suggestion that anything in the Animal Welfare Act or any regulation gives PETA any legal right to such information or reports.  PETA thus may claim that its resource-allocation decisions are injured by the absence of such reports from the agency; but that injury is not even colorably tied to a 'legally protected interest' in obtaining that information, as Lujan requires.").  Taking this binding caselaw at face value, however, it still does not change the result here.

At root, <u>PETA</u> turned on the existence of some cognizable legal interest in the underlying information.  But the Court previously held that Plaintiffs have "no legally cognizable interest in labeling spending 'coordinated' if that spending has already been disclosed in some format." <u>RTR I</u>, 520 F. Supp. 3d at 48.  That holding may have been erroneous based on the Circuit's subsequent ruling in <u>Clinton III</u>, 31 F.4th at 781, but it has preclusive effect in this subsequent action all the same.  <u>See</u> <u>RTR IV</u> at 16.  Bound by the Court's earlier determination, Plaintiffs lack a hook on which to hang their alleged organizational injury because a plaintiff "cannot ground organizational injury on a non-existent interest."  <u>EPIC</u>, 878 F.3d at 379.

The Court's prediction at the last outing has thus proven prophetic:  Although the Court did not address this exact theory of organizational standing in the delay case, its categorical language that Plaintiffs have no cognizable interest in labeling spending "coordinated" when that spending has already been disclosed in some format "slam[s] shut that door to federal court." <u>RTR IV</u> at 27.

*2.  Merits*

Even if Plaintiffs were not precluded from asserting an organizational injury based on the failure to determine whether certain Right to Rise expenditures were coordinated with the Bush campaign, they nevertheless fail to show an ongoing injury that the Court may remedy with the injunctive relief sought.

Synthesizing this Circuit's complex jurisprudence for organizational standing, courts in this jurisdiction have construed cases like <u>PETA</u> and <u>American Anti-Vivisection Society v. United States Dep't of Agric.</u> to permit groups to assert organizational injury distinct from informational standing by plausibly alleging that they were (1) denied access to information that would be useful to their organizations; and (2) deprived of an avenue of redressing some legal

violation or other wrong.  946 F.3d 615 (D.C. Cir. 2020); see, e.g., Marino v. Nat'l Oceanic &

Atmospheric Admin., 451 F. Supp. 3d 55, 60 (D.D.C. Mar. 26, 2020); CREW, 480 F. Supp. 3d at

130.  Plaintiffs attempt to weave together this double helix of organizational standing when

alleging that the Commission denied them access to information about Governor Bush's

coordinated expenditures and deprived them of a means of redressing a purported FECA

violation.  Neither strand withstands scrutiny.

  _Denial of Information_.  Plaintiffs primarily contend they have been denied access to

information regarding which expenditures were "coordinated" between the Bush campaign and

Right to Rise.  Without access to that information—which is plainly pertinent to their goal of

educating the public and sniffing out campaign-finance violations—Plaintiffs say they must

divert resources to fill the void.  Compl. ¶¶ 14–20.  That's a legitimate theory for organizational

standing, which has been accepted by courts in this jurisdiction.  See Campaign Legal Ctr. v.

FEC ("Clinton I"), 466 F. Supp. 3d 141, 153 (2020).  In this case, however, Plaintiffs fail to

plausibly allege that this information gap is causing an _ongoing_ injury to their groups.[5]

  Plaintiffs emphasize that they "still have not received all the information they are due

under the FECA from either Bush or [Right to Rise] Super PAC, nor full disclosure about the

scope of coordination between the respondents."  Opp'n at 24.  This point is undisputed.  But to

show a valid organizational injury—as opposed to an informational injury—Plaintiffs must go

---

  [5]  The Commission notes that a recent decision in this jurisdiction distinguished between
an organization's lack of access to a steady stream of information (which can serve as the basis
for an organizational injury) from the denial of access to one discrete data point (which cannot).
See Doc Society v. Blinken, No. 19-cv-3632 (TJK), 2023 WL 5174304, at *6 (D.D.C. Aug. 11,
2023).  Applying that distinction here, the Commission contends that Plaintiffs cannot base an
ongoing injury on a stream of information that "dried up no later than February 2016, when Bush
suspended his campaign."  Mot. Dismiss at 20.  Although the Court need not embrace this strict
dichotomy to resolve the present dispute, it generally agrees that an interest in one-off pieces of
information runs a greater risk of turning stale with the march of time.

the extra step of showing that this denial of information is interfering with their functions and forcing them to divert scarce resources.  Plaintiffs fail to do so.

In their complaint, Plaintiffs maintained they have had to divert resources from other planned organizational needs to research relevant law and fill in the gaps to the best of their ability, including by explaining to reporters, researchers, and partner organizations how to find information not properly reported.  See Compl. ¶¶ 17, 20.  "But while that may have been true when Bush was a frontrunner for the White House," the Court doubted in its prior opinion whether "these organizations are still diverting resources to address questions about a campaign that ended in defeat" almost a decade ago.  See RTR IV at 28.  Absent any indication that Plaintiffs are still diverting resources to make up for the alleged gap in the public record, the Court noted that Plaintiffs would not have an ongoing injury needed for the injunctive relief they seek here.  See id. at 28–29 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983)); see also Opp'n at 24 ("[Plaintiffs] do not deny that they must demonstrate an ongoing injury.").

Following these warnings, Plaintiffs did not submit affidavits showing they are in fact actively diverting resources to compensate for the informational shortfall concerning Governor Bush's campaign activities back in 2015.  Indeed, Plaintiffs have all but abandoned this central basis of the organizational injury advanced in their complaint.  Bending to reality, they now admit that "fewer reporters are still dialing CLC's line in connection to [their] administrative complaints."  Opp'n at 26 (cleaned up).  One might think that this concession would put an end to this protracted battle.  Think again.

Reaching out for a new ongoing injury, Plaintiffs contend that the Commission's failure to pursue their administrative complaints against Governor Bush has "encouraged an upsurge in schemes to game the timing of candidacy announcements to evade disclosure and circumvent

FECA's contribution limits." Id. at 26.  This theory is divorced from the groups' purported interest in unearthing the extent of coordination between the Bush campaign and Right to Rise to set the public record straight.  Plaintiffs instead advance a much more diffuse and elusive interest in having the FEC "get" Jeb Bush to deter others from violating the FECA in the future.  But this new theory stumbles at each of the three criteria for Article III standing: injury, causation, and redressability.  For starters, it is well-established that plaintiffs have no cognizable interest in the FEC "get[ting] the bad guys."  Free Speech for People v. FEC, 442 F. Supp. 3d 335, 343 (D.D.C. 2020).  The FECA's "citizen-suit" provision does not conflict with this core Article III limitation because it "does not confer standing; it confers a right to sue upon parties who otherwise already have standing.'"  Citizens for Resp. & Ethics in Washington v. FEC, 799 F. Supp. 2d 78, 85 (D.D.C. 2011) (quoting Common Cause v. FEC, 108 F.3d 413, 416 (D.C. Cir. 1997)).  Even assuming Plaintiffs suffered a cognizable injury, it is entirely speculative whether the FEC's decision not to prosecute the case against Governor Bush caused the alleged uptick in these schemes.  And it is equally conjectural whether these sorts of schemes would dry up—thereby freeing up Plaintiffs' resources—if the FEC were to pursue a case against Governor Bush at this late juncture.  See Lawyers' Comm., 424 F. Supp. 3d at 34 ("It must be likely, as opposed to merely speculative, that a favorable decision will provide redress.").  This novel theory of organizational standing therefore fails three times over.

Having failed to identify an ongoing injury, Plaintiffs pivot to arguments about the dangers of denying their claims to standing in this case.  They contend that "the mere passage of time cannot moot plaintiffs' injury" and maintain that a finding of mootness would suggest that "many courts to have considered whether the FEC's dismissal of an administrative complaint was contrary to law—including the Supreme Court in Akins—may have actually lacked

jurisdiction to reach that question." Opp'n at 24–25 (citing <u>FEC v. Akins</u>, 524 U.S. 11 (1998)). Worse still, they warn that finding their claims stale "would reward FEC delay by effectively immunizing belated dismissals from meaningful judicial review under 52 U.S.C. § 30109(a)(8)." <u>Id.</u> at 24.

These arguments, while consequential, are again misplaced because they overlook the major difference between this case and other FECA actions: Unlike most other FECA cases, including <u>Akins</u>, Plaintiffs are advancing an organizational (rather than informational) injury. Beyond showing they are actively being denied information that is sanguine to their groups, Plaintiffs must show that this denial of data is impeding their programmatic functions. <u>See</u> <u>RTR III</u> at 8 n.2 (describing the differences between informational and organizational standing).[6] In doing so, the Circuit has indicated that groups at some point might no longer have organizational standing to seek redress for alleged FECA violations committed by campaigns that have been swept aside into the dustbin of history. <u>See</u> <u>Citizens for Resp. & Ethics in Washington v. FEC</u>, 475 F.3d 337, 339 (2007) ("One might wonder why the case is not moot. The election is over; President Bush is constitutionally barred from running again; and Vice President Cheney has announced that he will not run."). That is the case here. Plaintiffs have not shown how this

---

[6] One notable exception is <u>Clinton I</u>, where the district court found that the plaintiffs had posited a valid organizational injury based on nearly identical allegations even though Senator Clinton's presidential campaign had concluded four years earlier. <u>See</u> 466 F. Supp. 3d at 152–54. In that case, though, the district court initially found the plaintiffs also had alleged a valid informational injury. <u>Id.</u> at 150–52. When the court reversed course on informational standing in <u>Clinton II</u>, it dismissed the entire case for lack of standing—despite its prior finding that the plaintiffs had organizational standing. While <u>Clinton II</u> wrote that "[t]he only injury-in-fact Plaintiffs have asserted here is an 'informational injury' inflicted by the FEC's dismissal of their administrative complaint," this statement (and the disposition) make sense only if the court determined that the organizational injury based on the deprivation of information had no legs if the closely related informational injury failed. 507 F. Supp. 3d 79 at 83. That, of course, is the exact result that the Court reaches here.

dearth of information about the spending of long-defunct campaign is actively interfering with their day-to-day operations, and this Court cannot excuse Article III requirements for functional reasons.

_Denial of Avenue of Redress_.  Plaintiffs similarly fall short in their attempt to ground their organizational injury in the closure of an administrative avenue to redress a legal wrong.

A long line of D.C. Circuit cases has held that "an organization may allege sufficient injury to its interests [when] the agency action at issue 'limits [the organization's] ability to seek redress for a violation of law."  Clinton I, 466 F. Supp. 3d at 153 (quoting Vilsack, 808 F.3d at 921); see, e.g., Action All. of Senior Citizens of Greater Philadelphia v. Heckler, 789 F.2d 931, 937–38 (D.C. Cir. 1986) (finding standing where plaintiffs pled that "challenged regulations den[ied] the . . . organizations access to information and avenues of redress they wish to use in their routine information-dispensing, counseling, and referral activities").  This line of precedent differs from the case at hand in an important respect though:  In each of these cases, the Circuit held that the plaintiffs had suffered a cognizable organizational injury when the government had prevented these groups from filing a certain category of administrative complaint.  That is not the case here.  The Commission has not foreclosed Plaintiffs from filing FECA complaints; rather, it has merely declined to act on one complaint involving Governor Bush's presidential campaign.

Judge Boasberg rightly recognized this difference in CREW, 480 F. Supp. 3d 118, when confronted with an analogous assertion of organizational injury based on the Office of Special Counsel ("OSC")'s alleged failure to follow through on an administrative complaint filed against Kellyanne Conway, then-Senior Counselor to President Trump, for her suspected Hatch Act violations.  "Unlike in PETA," Judge Boasberg explained, CREW remained entirely free to "bring allegations of Hatch Act violations to [OSC]'s attention" because OSC had not "changed

its complaint process nor adopted a policy categorically barring any type of complaints." Id. at 131.  It had simply decided not to pursue one administrative complaint lodged against a particular government official.  "While CREW may be unhappy with the President's refusal to punish a transgressing supporter," the court concluded, "that is a materially different harm from the one the Circuit found sufficient to confer standing in PETA." Id.  Finding standing based on the alleged failure to prosecute one particular administrative complaint would be inconsistent with "general standing principles."  Id.  "At bottom," Judge Boasberg reasoned, "CREW's beef is that OSC is flouting the statute by not prosecuting Conway before the [Merit Systems Protection Board]." Id.  And even assuming that Conway should have been prosecuted, "CREW has no greater stake" in that disciplinary proceeding "than any other member of the public," nor was CREW "entitle[d], more than any other member of the public, to invoke federal-court jurisdiction to compel OSC to prosecute." Id. (citations omitted).  Even a "self-appointed representative of the public interest . . . must show that the defendant's conduct has affected [it] in a 'personal and individual' way," which CREW could not do by pointing to a generalized interest in the full and fair enforcement of the laws.  Id. at 134.  The Supreme Court, after all, has made clear that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution" because "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." See id. (quoting Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973)).  Those bedrock rules applied to watchdog groups just as they apply to individual persons, Judge Boasberg concluded, so CREW lacked organizational standing to seek further action on their administrative complaint.  Id.

Same here.  While organizations may have standing to sue when the government shuts off an entire channel for lodging administrative grievances, they do not have a ticket to federal

court whenever an agency fails to act on one of their complaints.  See, e.g., Common Cause, 108 F.3d at 418 (explaining that the FECA's citizen-suit provision does not confer standing because there is no "justiciable interest in the enforcement of the law").  This case falls squarely into the latter category.  Accordingly, consistent with core Article III principles, Plaintiffs lack standing based on the mere fact that the Commission has decided not to prosecute a suspected violation of the law.

Plaintiffs attempt to escape this outcome by pointing to the need for general deterrence to prevent other candidates from taking a page out of "Bush's playbook" does not flip the script for the reasons already recounted.  See Opp'n at 26.  Plaintiffs have no cognizable legal interest in the Commission prosecuting this case to send shock waves through the system.  Cf. Linda R.S., 410 U.S. at 619.  And even if they did, the multi-linked chains of causation and redressability are far too attenuated for Article III purposes.  See Lawyers' Comm., 424 F. Supp. 3d at 34.  Accordingly, even if this route to organizational standing is not blocked by this Court's prior decisions, it is a dead end regardless.

B.  Undisclosed Expenditures

Plaintiffs next contend that they have a cognizable injury because they suspect there may still be some testing-the-waters expenditures that neither the Bush campaign nor Right to Rise ever disclosed in any fashion.  See Opp'n at 18–20.  In particular, they point to seven of Governor Bush's public appearances in early 2015 that, according to the FEC General Counsel's report, the Bush campaign failed to include in his disclosures.  See id.  Plaintiffs acknowledge they do not know whether Right to Rise actually reported expenditures for these events in its public disclosures, and that they are merely "speculating" about whether Right to Rise failed to report this testing-the-waters spending.  See id.  Nonetheless, Plaintiffs contend they cannot be

faulted for relying on rank speculation because it is the Bush campaign's failures to comply with the FECA that has forced them to "resort to conjecture." Id. at 19.  In making this argument, it is unclear whether Plaintiffs are asserting an organizational injury or relitigating the Court's prior decision that precluded them from using these "newly discovered" expenditures to cure the deficiencies in their earlier assertions of informational standing.  Either way, this argument does not get Plaintiffs home.

To the extent Plaintiffs are continuing to assert that these seven testing-the-waters events allow them to dodge the preclusive effect of the previous holding that they lack informational standing, the Court remains unpersuaded.  Plaintiffs gestured toward this argument in the prior outing when suggesting that these testing-the-waters events revealed in the MUR file may fall into the "curable defect" exception to issue preclusion, which "permits an action to proceed if the jurisdictional ground for dismissal of the original suit has been remedied by occurrences arising after the dismissal of the first action." Newdow v. Bush, 355 F. Supp. 2d 265, 274–75 (D.D.C. 2005).  The Court squarely rejected this argument for two reasons.  First, as in the delay case, Plaintiffs merely speculate that Right to Rise did not report its spending for these seven events.  An evidentiary hearing in the prior case revealed that Right to Rise had reported expenditures for all the events that Plaintiffs identified, and Plaintiffs never explain why the outcome would be different for these seven additional rallies. RTR IV at 24.  "Second, and more fundamentally, Plaintiffs fail to explain why they were unable to identify these alleged testing-the-waters events in the delay case when the Court afforded them ample opportunities to do so, dedicating an entire round of briefing and a hearing to this issue." Id.  It is therefore not "that this information *couldn't* be discovered but that Plaintiffs simply *didn't* discover it when given the opportunity." Id. (emphasis in original).

Plaintiffs object that "[t]he preclusive effect of the first jurisdictional judgment is limited to matters actually raised and necessarily decided; it does not extend to matters that *could have been raised*, as would the preclusive effect of a judgment on the merits." Opp'n at 19 (quoting GAF Corp. v. United States, 818 F.2d 901, 913 (D.C. Cir. 1987) (emphasis added)). But this stretches the narrow curable defect exception beyond its breaking point. The curable defect exception to issue preclusion is "sharply limited . . . by the requirement that new allegations of a sufficient 'precondition requisite' identify *occurrences subsequent to the original dismissal* that remedy the jurisdictional deficiency." Nat'l Ass'n of Home Builders v. EPA, 786 F.3d 34, 41–42 (D.C. Cir. 2015) (emphasis in original) (cleaned up). "That limitation prevents the 'curable defect' exception from undermining the preclusive effect of issues already fairly and finally determined in prior litigation." Id. All the "new" information about Governor Bush's speaking engagements revealed in the MUR file was apparently hiding in plain sight, accessible in the public record during the delay case. Accordingly, as the Court previously held, there "is no reason to excuse Plaintiffs from issue preclusion; it is the reason issue preclusion exists." RTR IV at 25.

Plaintiffs fare no better in arguing that these seven testing-the-waters events provide an organizational injury. Even assuming there is some testing-the-waters spending that neither the Bush campaign nor Right to Rise disclosed—an assumption lacking support—Plaintiffs would still need to show an ongoing organizational injury stemming from this underreporting. Yet for all the reasons already discussed, it is hard to fathom how any shortfall in the financial reporting about seven events that occurred almost a decade ago is currently interfering with these groups' programmatic activities or causing them to reallocate resources. That may have rung true when Governor Bush was leading the pack in 2015, but it does not today. And "where the plaintiffs

seek declaratory and injunctive relief, past injuries alone are insufficient to establish standing."
Dearth v. Holder, 641 F.3d 499, 501 (D.C. Cir. 2011).

    C.  Statement of Reasons

      As a final Hail Mary, Plaintiffs contend they have organizational standing based on the
FEC's failure to provide a reasoned explanation for dismissing their administrative complaints
against Governor Bush.  The Commission did not address this theory of organizational standing
in its reply brief—perhaps subscribing to the view that Plaintiffs cannot wait until the opposition
brief to raise a new theory of standing that was not outlined in the complaint.  See Lawyers'
Comm., 424 F. Supp. 3d at 32 ("Plaintiffs waited until filing their opposition to allege the facts
that might support standing based on expenditure of resources.  But a plaintiff cannot use an
opposition brief to amend its complaint.").  Although the Court would have appreciated the
Commission's views on this matter, it nonetheless finds that this last-minute pass at
organizational standing falls short of the end zone.

      Pointing to Commissioner Weintraub's deliberately deficient "statement of reasons" for
the dismissal of their administrative complaints, Plaintiffs contend that they were wrongly
deprived of a reasoned account for the Commission's failure to pursue this case against Governor
Bush.  See Opp'n at 21–23.  "The Commission has thus failed to meet even the most basic rule
of reasoned decisionmaking," they complain, as its official explanation did not "shed any light
on how [it] analyzes the issues of law raised by the administrative complaints, or [] find any facts
illuminating the relationship between the [Right to Rise] committees and the Bush campaign."
Id. at 20–21.  Plaintiffs say this abdication of the Commission's duty to explain its reasoning left
them in the lurch, as the FEC's continued "silence has allowed Bush-style evasions of campaign
finance disclosure requirements to continue across multiple election cycles unchecked, requiring

plaintiffs to expend additional resources to both police these abuses and educate the public."  Id. at 21.  Therefore, while Plaintiffs admit that they "may not have an informational 'right' to a statement of reasons setting forth the controlling Commissioners' factual findings and conclusions of law," they nonetheless contend that "the lack of this guidance has injured [their] operations."  Id. at 5.

The Court disagrees.  For starters, "Plaintiffs concede that they are aware of no case law considering whether the 'deprivation' of a statement of reasons can constitute a cognizable injury to a FECA complainant, organizational or otherwise."  Id. at 21.  In fact, Plaintiffs have not identified *any* precedent, no matter the domain, where a court predicated an Article III injury on an agency's allegedly deficient explanation for its action.  From its own review of the caselaw, the closest analog that the Court could identify comes in the context of the National Environment Policy Act ("NEPA"), where courts occasionally have found valid injury where agencies did not produce the required impact statement for a project, thereby preventing outside environmental groups from informing the public about the expected effects.  See, e.g., Scientists' Inst. for Pub. Info., Inc. v. AEC, 481 F.2d 1079, 1087 n.29 (D.C. Cir. 1973).  But NEPA vests the public with an informational right in a project's environmental impacts, while Plaintiffs acknowledge that the FECA does not similarly require the FEC to ventilate its views on the legal issues presented in every complaint.  After all, it is well established that the FEC need not express any view on the underlying merits of a complaint if it declines to pursue a complaint for reasons of prosecutorial discretion.  Free Speech for People v. FEC, No. CV 22-666 (CKK), 2024 WL 3617481, at *4 (D.D.C. Aug. 1, 2024) (citing End Citizens United PAC v. FEC, 90 F.4th 1172, 1178 (D.C. Cir. 2024)).  The Court thus doubts that failure to deliver a sufficient statement of reasons in this context necessarily confers standing on the party who filed the administrative

complaint.  The contrary result would appear to open the floodgates to advocacy groups' claims whenever they are dissatisfied with an agency's explanation for the reasons behind its decision.

But even assuming this is a possible route to federal court, the Court's prior analysis reveals the problems with Plaintiffs' argument for standing based on the FEC's faulty account for its dismissal.  Plaintiffs have not shown that the lack of guidance on how the Commission views the legal issues presented in their complaints has in fact caused "Bush-style evasions of campaign finance disclosure requirements" to reoccur, just as they could not show that the Commission's failure to prosecute their complaint did.  See supra at 19–20.

Nor do Plaintiffs identify a legal issue in need of clarification by the Commission.  Instead, they present Governor Bush's actions in 2015 as a brazen violation of the FECA—a view reflected in the FEC General Counsel's now-public report, which already offers ample "guidance" on the legal issues raised in this case.  See First General Counsel's Report.  Though the Commission never wrangled the four votes necessary to proceed with this action, there is no indication that this gridlock was caused by uncertainty about the FECA's restrictions in this domain.  The stalemate instead appears to have been the product of partisan disputes between commissioners no longer sitting on the Commission.  And when explaining the decision to dismiss the 2022 complaints, a new controlling block of three commissioners did not state that Governor Bush had not violated the FECA.  Instead, they cited the staleness of the case and the elapsed statute of limitations.  See Dickerson Statement.  On remand, it appears exceedingly likely that the Commission would cite that same passage of time in explaining why it declined to proceed with an almost decade-old case against Governor Bush.  Or maybe the Commission would stalemate once more and fail to issue any official Statement of Reasons.  Either way, perhaps the *least* likely outcome here is that the Commission will offer an exegesis on the

applicable law or an official "advisory opinion" on Governor Bush's presidential campaign that will aid Plaintiffs' mission or free up their time and resources.

Accordingly, even under the relaxed redressability standard that is oftentimes applied to alleged procedural violations, Plaintiffs do not plausibly allege how remanding this case to the Commission for further explanation would clear up confusion and allow them to conserve scarce resources. See Mendoza v. Perez, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (noting "the normal standards for immediacy and redressability are relaxed" for violations of procedural rights). That's because, in actuality, what Plaintiffs seek is not greater clarity on the law but an opportunity to make an example out of Governor Bush and Right to Rise to deter others from following their "playbook." See Opp'n at 27. But as discussed, organizations (like other litigants) do not have a cognizable interest in "getting the bad guys" to achieve some semblance of general deterrence. See Free Speech for People, 442 F. Supp. 3d at 343. So, while the Court awards Plaintiffs points for creativity in crafting this new theory of organizational standing, it is not enough to punch their ticket to federal court.

### IV. Conclusion

None of this is meant to diminish Plaintiffs important work in safeguarding our elections or to downplay the gravity of the allegations they raised in this lawsuit. There is good reason to question the machinations of Governor Bush's presidential bid in early 2015. But whatever the merits, the Court cannot bend the rules that restrict its power to resolve cases and controversies. And, in this case, Plaintiffs have not presented a plausible theory of Article III standing. This result is an oddity that is unlikely to be repeated going forward. Plaintiffs (and others like them) in the mine-run of similar cases should be able to enter federal court by asserting informational standing. Yet Plaintiffs here are foreclosed from taking that clear path because of this Court's

judgments and their own missteps in the prior delay case, and organizational standing does not provide them with a workaround.

For these reasons, the Court will grant the Commission's Motion to Dismiss.  A separate Order accompanies this Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  September 23, 2024